Larry CANNON, Appellant,

v.

UNITED STATES of America.

No. 79–1762.

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 9, 1980.

Decided April 1, 1981.

James A. McKowen *, with whom Michael E. Geltner (appointed by this Court) and Larry J. Ritchie, Washington, D. C., were on the brief for appellant.

Robert C. Seldon, Asst. U. S. Atty., Washington, D. C., with whom Charles F. C. Ruff, U. S. Atty., John A. Terry and Michael W. Farrell, Asst. U. S. Attys., Washington, D. C., were on the brief for appellee. Martha P. Rogers, Asst. U. S. Atty., Washington, D. C., also entered an appearance for appellee.

Before ROBINSON, MacKINNON and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

Society sends convicted men and women to prison to punish them through loss of liberty and deprivation of the comforts of life, to rehabilitate them, and to keep them out of the community until such time as they can live by its rules. It does not and should not send them to prison to be beaten, maimed, savaged, even killed, by their fellow inmates. Excessive failure on the part of prison officials to protect inmates from such assaults, leading to a virtual "reign[ ] . . . [of] terror," has been justifiably held to constitute its own form of cruel and unusual punishment, forbidden by the eighth amendment.[1] But, unfortunately, sporadic outbreaks of violence have historically been associated with prison settings.[2] Courts

---

* Student Counsel pursuant to Rule 20.

1. *See Leonardo v. Moran*, 611 F.2d 397, 398–99 (1st Cir. 1979); *Little v. Walker*, 552 F.2d 193, 197–98 (7th Cir.), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1977); *Woodhous v. Commonwealth of Virginia*, 487 F.2d 889, 890 (4th Cir. 1973).

2. Continuing fiscal restraints, which have led to correctional officer cutbacks and institutional overcrowding, have exacerbated this problem. In fiscal 1980, for example, budget constraints forced the District of Columbia Department of Corrections ("Department") to eliminate 330 positions, including approximately 150 correctional personnel, despite a "relatively precarious" security situation. *District of Columbia Appropriations for 1981: Hearings Before the*

have traditionally stepped in to afford protective relief only when the level of violence reached unreasonable proportions[3] or to grant redress when a plaintiff showed a direct relationship between his injury and the negligence of prison officials.[4]

This case arises from an assault by one (or more) inmates upon another inmate at Lorton Reformatory.[5] The plaintiff, Larry Cannon, was stabbed and beaten by an unknown assailant(s) while attending an unsupervised gathering in the prison gymnasium. Contending that the attack would not have taken place but for the prison officials' negligent failure to provide appropriate security, appellant sued the United States for damages under the Federal Tort Claims Act ("Act" or "FTCA"), 28 U.S.C. § 2671 et seq. The Government moved before trial to dismiss the case on the ground that Lorton Reformatory is not a federal agency as defined by the Act, and therefore that the United States cannot be found liable for any negligence on the part of Lorton's officials. This motion was denied by the judge initially assigned to the case. *Cannon v. United States*, No. 77–0841 (D.D.C., May 17, 1978) (order denying motion to dismiss); Record on Appeal ("R.") 14. After a three day trial before a different judge the district court held for the United States on the

merits, finding both that the prison officials had not been negligent and that Cannon had "assumed the risk" of his injuries. Cannon now appeals from this unfavorable judgment. The Government both defends the trial judge's findings and asserts that the initial denial of its motion to dismiss was in error.

We hold for the Government on the second ground. The motion to dismiss should have been granted because the FTCA does not render the United States liable for the negligent actions of Lorton prison officials. Since we so hold, we need express no view on the correctness of the court's rulings on the negligence and "assumption of risk" issues.

## I. THE FACTS

Cannon was tried and convicted in the United States District Court for the District of Columbia in 1969 of two counts of robbery and one count of assault with intent to commit rape.[6] Initially incarcerated in federal penitentiaries located in Terre Haute, Indiana, and Atlanta, Georgia, Cannon was transferred to Lorton Reformatory in 1972.[7]

On June 5, 1974, Cannon, along with approximately 75 other inmates, attended a meeting held in Lorton's gymnasium to dis-

---

*Subcomm. of the House Comm. on Appropriations ("1981 Appropriations")*, 96th Cong., 2d Sess. 1401 (1980) (testimony of W. Golightly, Asst. Dir. of Admin., D.C. Dept. of Corrections). District penal institutions are also allegedly in a deteriorated physical condition. *Id.* at 1391 (Capital Improvements Program Project Schedule). These problems, among others, have spawned ongoing lawsuits alleging that conditions at Lorton violate the eighth amendment. *See Lewis v. United States*, No. 79–1727 (D.D.C., filed July 3, 1979).

3. *See* note 1 *supra* (citing cases).

4. *Compare Cohen v. United States*, 252 F.Supp. 679 (N.D.Ga.1966), *rev'd on other grounds*, 389 F.2d 689 (5th Cir. 1967) (negligence found) *with Fleishour v. United States*, 244 F.Supp. 762 (N.D.Ill.1965), *aff'd*, 365 F.2d 126 (7th Cir.) *cert. denied*, 385 U.S. 987, 87 S.Ct. 597, 17 L.Ed.2d 448 (1966) (no negligence found).

5. The Department's statistics show that approximately 400 serious inmate assaults were reported as occurring at Lorton between 1973 and 1979. Complaint at 18, *Phillips v. United*

*States*, No. 79–1726 (D.D.C., filed July 3, 1979), *consolidated with Lewis v. United States*, No. 79–1727 (D.D.C., filed July 3, 1979).

6. 22 D.C.Code § 2901 (robbery); 22 D.C.Code § 2801 (rape). Cannon was tried and convicted in the United States District Court for the District of Columbia because prior to the effective date (1971) of the relevant provisions of the District of Columbia Court Reform and Criminal Procedure Act of 1970 ("the Court Reform Act"), 84 Stat. 473 *et seq.*, the federal court had exclusive jurisdiction of all felonies committed in the District. 11 D.C.Code § 521 (1967).

7. Cannon requested the transfer to Lorton. Though initially denied, his request was granted as part of a larger exchange of prisoners between the Department and the Federal Bureau of Prisons ("FBOP" or "Bureau"). R.10 (Defendant's Exhibit Nos. 1–7). The Attorney General approved the transfer pursuant to the provisions of 24 D.C.Code § 425 and 18 U.S.C. § 4082(b).

cuss their grievances and the possibility of a prison strike.[8] The meeting had not been authorized by prison officials, but rather had been called by the leaders of two rival prisoners' groups.[9] No guards were posted inside the gymnasium during the meeting. Cannon, a leader of a third prisoners' group called the ALERTS, actively participated in this discussion. After one particularly vigorous exchange with another prisoner, an unknown assailant(s) hit Cannon on the head with a lead pipe and stabbed him in the chest. Cannon spent six days in the hospital and prison infirmary recuperating from this attack; he claims it left him with permanent lung damage.[10] The gist of his negligence claim is that the prison officials knew or should have known of the meeting and provided guards to ensure the safety of its participants.

## II. THE ISSUE

Cannon claims the United States is liable under the FTCA because his injuries were "caused by the negligent or wrongful act or omission of an[ ] employee of the Government." 28 U.S.C. § 1346(b). Section 2671 of Title 28 U.S.C. defines an "employee of the Government" to include:

> officers or employees of any federal agency, members of the military or naval forces of the United States, and *persons acting on behalf of a federal agency* in an official capacity[.]

(Emphasis supplied.) The same provision defines "federal agenc[ies]" as:

> the executive departments and independent establishment of the United States, and corporations primarily acting as in-

strumentalities or agencies of the United States *but does not include any contractor with the United States.*

(Emphasis supplied.)

Cannon contends both (1) that Lorton Reformatory is an agency of the United States, as well as of the District of Columbia, and (2) that its employees, in any case, are "persons acting on behalf of a federal agency in an official capacity" when they undertake to supervise federal prisoners who have been committed to the legal custody of the Attorney General. The Government argues that Lorton, like the Nueces County jail in *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), is sufficiently outside the sphere of direct federal control that it must be considered an independent contractor with the United States for the purposes of the FTCA. The Government contends that the statutory delegation of day-to-day control of Lorton to District authorities in 24 D.C. Code § 442 renders Lorton an independent contractor (or its functional equivalent) with the federal government for the purpose of caring for federal prisoners housed there, and thus precludes federal liability for torts occasioned in the performance of that duty.

In denying the Government's motion to dismiss the claim for lack of jurisdiction, the district court found it "irrelevant that the District of Columbia Department of Corrections has charge of the actual management and regulation of the Lorton Reformatory" as the "defendant was committed to the custody of the Attorney General

---

8. The testimony at trial was conflicting as to whether a strike had ever taken place. A witness for the plaintiff testified that one of the inmate groups had called a work-stoppage for June 4. Transcript of April 6, 1979 ("Tr. 4/6/79") at 85 (testimony of Curry-Bey). However, the plaintiff testified that a strike had merely been "proposed" for June 5. *Id.* at 167. Lorton's superintendent, Marion Strickland, was unable to recall any strike on either of those dates, though he validated a prison log showing that an announcement declaring the end of a strike had been made over Lorton's public address system at 10:35 A.M. on June 5. *Id.* at 243, 246–47.

9. The leaders of one prisoners' group, the PAL, called the meeting to place the leaders of a rival group, the ORC, "on trial" for collaboration with the prison authorities. Tr. 4/6/79 at 23, 169.

10. The defense countered with evidence tending to prove that the chest wounds sustained by the plaintiff during the attack were superficial and could not have affected his lungs. Tr. 4/9/79 at 61–63 (testimony of Dr. Whitehill).

pursuant to D.C.Code § 24–425." *Cannon v. United States*, No. 77–0841 (D.D.C., May 17, 1978) (order denying motion to dismiss); R. 14. In doing so, it relied on a prior opinion of this court, *Close v. United States*, 397 F.2d 686 (D.C.Cir.1968), which held that a federal prisoner temporarily lodged in the District of Columbia Jail could sue under the Act for injuries due to the negligence of his jailers.

## III. ANALYSIS

### A. *The Contractor Exception to the FTCA*

#### 1. The Scope of the Exception

The alternate theories on which Cannon's FTCA suit depends are that Lorton is a federal agency or that its employees were acting, with respect to Cannon, on behalf of a federal agency. Both fall if we conclude Lorton was a contractor with the United States or its functional equivalent under the applicable statutes.

In *Logue v. United States*, 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), the parents of a federal pretrial detainee who committed suicide while lodged in a county jail pursuant to a contract between the Bureau and the county sued the federal government for damages under the FTCA.[11] Like Cannon, they alleged that either the Nueces County jail was an agency of the United States or that the employees of that jail were "acting on behalf of" the federal government. 412 U.S. at 526, 93 S.Ct. at 2218.

The Court rejected both claims.[12] It held first that the jail could not be an agency of the federal government because it fell with-

in the " 'contractor' exemption from the definition of 'Federal agency' in § 2671." *Id.* The Court then considered the argument advanced by the judges of the Court of Appeals who had dissented from the denial of rehearing en banc[13] that "even though the sheriffs' employees might not be 'employees' of a federal agency, they might nonetheless be 'acting on behalf of a Federal agency in an official capacity[.]' " 412 U.S. at 530, 93 S.Ct. at 2220. Reasoning that "since it would be a rare situation indeed" in which an independent contractor would not be performing tasks that could be performed by a salaried federal employee, the Court found that reading the clause to render the government liable for the activities of any person assuming the statutory obligations of the United States would make the contractor exception "meaningless." *Id.* at 531–32, 93 S.Ct. at 2221. Therefore, the Court concluded, after surveying the relevant committee hearings, that the language is "designed to cover special situations such as the 'dollar-a-year' man ... or an employee of another employer who is placed under direct supervision of a federal agency[.]" *Id.* at 531, 93 S.Ct. at 2221. In sum, *Logue* says that the federal government cannot be held liable for the torts of employees of an independent contractor jailer whether that liability is predicated on the "agency" or "acting on behalf of" language in the FTCA.

#### 2. The Definition of a "Contractor"

The statute nowhere defines the term "contractor." The legislative history of the FTCA is also barren of any direct reference to this exception.[14] However,

---

11. The plaintiffs alleged, and the district court found, that Logue's death was proximately caused by the negligence of the jail's employees. His jailers were aware of his suicidal tendencies yet failed to make arrangements for his constant surveillance. *Logue v. United States*, 459 F.2d 408, 410 (5th Cir. 1972).

12. The Court remanded the case, however, for consideration of the question whether the United States Deputy Marshal's failure to make specific arrangements for constant surveillance of Logue constituted negligence inasmuch as the Deputy Marshal was also aware of Logue's

previous suicide attempt. 412 U.S. at 532–33, 93 S.Ct. at 2221–22.

13. *See Logue v. United States*, 463 F.2d 1340 (5th Cir. 1972).

14. The only reference to this aspect of the coverage of the Act is this vague paragraph, reprinted in successive committee reports:

> Title I contains definitions of certain words and phrases, which make it clear that the bill covers all Federal agencies, including corporate instrumentalities, and all Federal officers

throughout the tortuous history of the Act, one theme continuously echoes: "[t]he liability of the United States will be the same as that of a private person under like circumstance, in accordance with local law, except that no punitive damages and no interest prior to judgment may be recovered." S.Rep.No.1400, 79th Cong., 2d Sess. 32 (1946). *See also* S.Rep.No.1196, 77th Cong., 2d Sess. 6 (1942); H.R.Rep.No.2245, 77th Cong., 2d Sess. 9 (1942). The Supreme Court has read that statement to indicate that "the 'contractor' exemption from the definition of 'Federal agency' in § 2671 . . . adopt[s] the common-law distinction between the liability of an employer for the negligent acts of his own employees and his liability for the employees of a party with whom he contracts for a specified performance."[15] *Logue v. United States, supra,* 412 U.S. at 526–27, 93 S.Ct. at 2218–19. Relying on both the modern common law as

reflected in the Restatement of Agency[16] and the law of Texas,[17] the Court concluded in *Logue* that "the distinction between the servant or agent relationship and that of independent contractor turn[s] on the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." *Id.* at 527, 93 S.Ct. at 2219. The law of the District, like the law of Texas, adopts the Restatement's control-of-physical-conduct test to distinguish between employees and independent contractors.[18]

### B. Does Lorton Fall Within the Contractor Exception?

Applying this control test to the facts in *Logue,* the Court held that the Nueces County jail was a contractor with the federal government within the exception to the FTCA. It cited to the fact that the Nueces County jail was a "contract" jail; the Bu-

---

and employers, including members of the military and naval forces.

H.R.Rep.No.2245, 77th Cong., 2d Sess. 8 (1942). *See also* H.R.Rep.No. 1287, 79th Cong., 1st Sess. 4 (1946); S.Rep.No.1400, 79th Cong., 2d Sess. 31 (1946); S.Rep.No.1196, 77th Cong., 2d Sess. 5 (1942). The Supreme Court has already noted the lack of "helpful committee prints" in the area, attributing this failure to the "long gestation period of the Act." *Logue v. United States, supra,* 412 U.S. at 530–31, 93 S.Ct. at 2220–21.

15. This distinction makes sense in light of the purposes of the FTCA. The main goal of the Act was to lift the veil of sovereign immunity so that the federal government could be sued as if it were a private person for ordinary torts, such as motor vehicle accidents. *See* text at note 15. The legislators were primarily concerned with giving a remedy to persons heretofore effectively without one. They were not concerned with providing plaintiffs with a choice of defendants. Thus, where alternate defendants exist (presumably, though not necessarily, independent contractors will not be shielded from suit by sovereign immunity), no special need exists to subject the federal government to liability. In fact, most federal prisoners housed in state and local facilities can sue the non-federal entity charged with the operation of the prison. Thirty-seven states have waived their sovereign immunity from such suits. *See* Note, *Physical Security in Prison: Rights Without Remedies?* 12 New England L.Rev. 269, 274 (1976). The District of Columbia has no such immunity. *See Graham v. District of Columbia,* 433 F.2d 536 (D.C.Cir.

1970) (reversing dismissal on sovereign immunity grounds of negligence suit filed by victim of assault in District station house jail); *Gaither v. District of Columbia,* 333 A.2d 57 (D.C. 1975) (reversing directed verdict against prisoner suing District for damages for injuries due to negligence of Lorton employees).

16. Restatement (Second) of Agency § 2 (1958):

(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.

(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.

(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

17. *See* 412 U.S. at 527 n.6, 93 S.Ct. 2219 n.6.

18. *See Rose v. Silver,* 394 A.2d 1368, 1371 & n.3 (D.C.1978) (quoting Restatement (Second) of Agency); *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 812 n.7 (D.C.1976) (en banc); *Quijada Corp. v. General Motors Corp.,* 253 A.2d 538, 540 (D.C. 1969).

reau had entered into a contractual relationship with the county whereby the United States Treasury paid the county for housing federal prisoners. The contractual relationship was authorized by 18 U.S.C. § 4002, which provides:

> For the purpose of providing suitable quarters for the safekeeping, care, and subsistence of all persons held under authority of any enactment of Congress, the Director of the Bureau of Prisons may contract, for a period not exceeding three years, with the proper authorities of any State, Territory, or political subdivision thereof, for the imprisonment, subsistence, care, and proper employment of such persons.[19]

The contract incorporated by reference the various standards of care contained in the statute and regulations of the Bureau of Prisons.[20] 412 U.S. at 523 n.2, 93 S.Ct. at 2217 n.2. However, it did not give the United States the authority to physically supervise the conduct of the jail's employees; it merely reserved to the United States " 'the right to enter the institution . . . at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed.' " Id. at 530, 93 S.Ct. at 222.

The Court found on the basis of these facts that this contract reflected a "division of responsibility" which "clearly contemplated that the day-to-day operations of the contractor's facilities were to be in the hands of the contractor with the Government's role limited to the payment of sufficiently high rates to induce the contractor to do a good job." Id. at 529, 93 S.Ct. at 2220. This division of responsibility demonstrated that the Nueces County jail employees were employees of an independent contractor and not employees of the United States within the meaning of the FTCA.[21]

---

**19.** The Court pointed out that "800 institutions operated by state and local governments . . . contract with the Federal Bureau of Prisons to provide for the safekeeping, care, and subsistence of federal prisoners." 412 U.S. at 523, 93 S.Ct at 2217. 18 U.S.C. § 4082(b) grants the Attorney General the power to "designate as a place of confinement [for anyone convicted of a crime against the United States and committed to his custody] any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, . . . and may at any time transfer a person from one place of confinement to another."

**20.** The county undertakes to provide custody in accordance with the Bureau of Prisons' "rules and regulations governing the care and custody of persons committed" under the contract. These rules in turn specify standards of treatment for federal prisoners, including methods of discipline, rules for communicating with attorneys, visitation privileges, mail, medical services, and employment. But the agreement gives the United States no authority to physically supervise the conduct of the jail's employees; it reserves to the United States only "the right to enter the institution . . . at reasonable hours for the purpose of inspecting the same and determining the conditions under which federal offenders are housed."
Id. at 530, 93 S.Ct. at 2220.

**21.** Cf. United States v. Orleans, 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). In Orleans, the question was whether the Warren-Trumbull Council, a community action organization funded by the Office of Economic Opportunity ("OEO") pursuant to the Economic Opportunity Act of 1964 ("EOA"), was a federal agency within the meaning of the FTCA. While returning from a recreational outing sponsored by the Council, a private car for which the Council had made arrangements was involved in a collision; one child riding in the car was injured. The child and his father sued the United States, alleging negligence on the part of the agents of the United States in organizing and supervising the outing. The Court held the Council to be an independent contractor of the United States, despite the fact that it was fully federally funded, implemented pre-packaged federal programs, and its financial affairs were monitored by the OEO to prevent fraud and waste. The Court based its decision on the fact that the OEO did not, and had no power to, "supervise the daily operation of a community action agency or a neighborhood program." 425 U.S. at 818, 96 S.Ct. at 1977. Rather, the government's supervisory power was limited to ensuring that the agency complied with the "specifications of a contract or grant"; the agency remained free to "select the means of its implementation." Id. at 815–16, 96 S.Ct. at 1976 (footnote omitted). Moreover, the Court pointed out, the Council was legally local corporation, administered by a "community action board composed of local officials, representatives of the poor and members of business, labor and other groups in the community." Id. at 817, 96 S.Ct. at 1977 (emphasis in original). No OEO officials could sit on the board. Id. Finally, the Council was

Lorton, however, is not a state or local institution; it is an "integral part of the District of Columbia correctional system."[22] Two lines of inquiry must be pursued, therefore, before we conclude that Lorton, like the Nueces County jail, falls under the same reasoning the Court employed in construing the contractor exception in *Logue*. First, we will analyze the *legal* relationship between Lorton and the United States Government to insure that Lorton is not in fact acting as an agency of the United States or its employees acting "on behalf of" the United States. Second, we will examine the *actual* "division of responsibility" between the Bureau and the Department as it affects the care and treatment of federal prisoners housed in Lorton to see if—apart from statute or regulation—there are practical accommodations that evidence federal control over the institution so as to make it appropriate that the United States be held liable under the FTCA for the negligence of Lorton employees.

### 1. The Legal Relationship Between Lorton and the Federal Government

In 1909, Congress passed a special act[23] ordering the construction of Lorton Reformatory on federally owned property in Virginia. However, in 1946, Congress enacted a statute granting the governing body of the District of Columbia effective control over the Reformatory. 24 D.C.Code § 442, the 1946 Act, gives the Major and Council of the District of Columbia

> charge of the *management and regulation* of the Workhouse at Occoquan in the State of Virginia, the Reformatory at Lorton in the State of Virginia, and the Washington Asylum and Jail, and [the] ... *responsib[ility] for the safekeeping, care, protection, instruction and discipline of all persons committed to such institutions.*[24]

(Emphasis supplied.) The same statute explicitly delegates to the District of Columbia Council the "power to promulgate rules and regulations for the government of such institutions," and to the District of Columbia Department of Corrections, "the power to establish and conduct industries, farms, and other activities, to classify the inmates, and to provide for their proper treatment, care, rehabilitation, and reformation." *Id.*

More recent legislative events confirm Congress' continued intention to let the District control the operation of Lorton. In 1970 and 1973, while considering passage of the Court Reform Act[25] and the Home Rule Act,[26] Congress debated whether to reassert federal control over Lorton. On both occasions, efforts spearheaded by Senator Scott of Virginia[27] to transfer its operational control to the Bureau of Prisons failed.

encouraged to develop nonfederal sources of funding. *Id.* As in *Logue*, the decisive question was whether the agency's "day-to-day operations are supervised by the Federal Government." *Id.* at 815, 96 S.Ct. at 1976. Finding that they were not, the Court reversed the court of appeals decision allowing the suit.

**22.** *McCall v. Swain*, 510 F.2d 167, 170 (D.C.Cir. 1975).

**23.** Act of March 3, 1909, 35 Stat. 717.

**24.** The original act, 60 Stat. 320, ch. 507, § 2, placed the "charge of the management and regulation" of the various prison facilities in the hands of the Department of Corrections "under the general direction and supervision of the Commissioner of the District of Columbia." The Reorganization Plan No. 5 of 1952 abolished that Department of Corrections and transferred its functions to the Board of Commissioners of the District of Columbia. This Board was in turn abolished by § 402(213) of the Reorganization Plan No. 3 of 1967; its powers under this section were transferred to the District of Columbia Council and the Commissioner, which in turn were extinguished by the District of Columbia Self-Government and Reorganization Act ("Home Rule Act"), Pub.L. No.93–198, 87 Stat. 774 (1973), and replaced by the Council of the District of Columbia and the Mayor of the District of Columbia, respectively.

**25.** Pub.L.No.91–358, 84 Stat. 473 *et seq.* (1970).

**26.** *See* note 24 *supra.*

**27.** Senator Scott at one time represented the Congressional district in Virginia in which Lorton is situated. The relations between his former constituents and the prison have not always been amicable. For example, the county in which Lorton is located sued the United States and the District of Columbia for injunctive relief and damages, alleging *inter alia* that the operation of Lorton constituted a public

The Reformatory is currently, and was at the time of Cannon's injury, staffed exclusively by employees of the Department.[28] These employees were hired, trained by and responsible to the officials of that Department, not the Bureau.[29] As the district court in *Curry-Bey v. Jackson*, 422 F.Supp. 926 (D.D.C.1976),[30] recognized, the officials of the Department have the power to formulate the regulations and policies under which their employees operate, and are not bound by those formulated by the Bureau.[31] Department officials, in turn, are responsible to the Council and Mayor of the District of Columbia. According to the undisputed affidavit of Clair Cripe, Acting Director of the Bureau, "the D.C. Department of Corrections is an independent entity of the D.C.

Government subject only to the supervision and control of the Mayor and Council of the District of Columbia." R. 10 (Defendant's Exhibit No. 9 at 2). He further stated that 24 D.C.Code §§ 441–42 "precludes this office or the Attorney General from exercising any management control over the actions of the District of Columbia Department of Corrections as it regards the operation, classification and treatment of offenders contained within the penal facilities of that entity." *Id.*

As far as fiscal control over Lorton is concerned, the federal government exercises no greater leverage over it than over any other District of Columbia facility or agency. Although Congress must still approve the District budget,[32] it is the District

---

nuisance in 1977. The county maintained that the Attorney General could be enjoined from designating a public nuisance as a "suitable place of confinement" for federal prisoners. *See Board of Supervisors v. United States*, 408 F.Supp. 556 (E.D.Va.1976), *appeal dismissed*, 551 F.2d 305 (4 Cir. 1977). While still a member of the House, Scott sponsored a provision in the Court Reform Act which would have conferred jurisdiction over Lorton Reformatory on the Department of Justice. This provision was made a part of the House, but not the Senate bill, and was eliminated in conference. *See* H.R.Rep.No.1303, 91st Cong., 2d Sess. 241 (1970). Senator Scott later tried to enact a similar provision as part of the Home Rule Act. His amendment was defeated on the floor of the Senate after Senator Eagleton argued that the District needed to have "jurisdiction over that penal institution, including the management, control, and parole practices in connection therewith" as an incident of self-government of local affairs. *See* 119 Cong.Rec. 22949–59, 22964 (July 10, 1973), *reprinted in* Staff of the Senate Comm. on the District of Columbia, 93d Cong., 1st Sess., Legislative History of District of Columbia Self-Government and Governmental Reorganization Act 359–372, 384 (Comm. Print 1974). *See generally Milhouse v. Levi*, 548 F.2d 357, 362 n.13 (D.C. Cir.1976).

**28.** At the time of Cannon's injury, Department employees were members of the federal civil service. *See* Defendant's Tab A, Appendix to R. 39a (Answers to Interrogatories). The Home Rule Act provided for the creation of an independent District personnel system and the transfer of all District employees to it within five years. *See* 1 D.C.Code § 162(2). Therefore, the current employees of the Department are members of the District's merit personnel system rather than the federal civil service.

**29.** Tr. 4/6/79 at 227–28 (testimony of Marion Strickland, Superintendent of Correctional Services at Lorton).

**30.** In *Curry-Bey v. Jackson*, 422 F.Supp. 926 (D.D.C.1976), the United States District Court for the District of Columbia rejected the plaintiff's claim that District of Columbia Code offenders, because committed to the custody of the Attorney General under 24 D.C.Code § 425, were entitled to the same procedural rights prior to a transfer as federal prisoners held in federal prisons. The court held that no equal protection claim had been made out because "[s]ection 24–442 [of the D.C.Code] clearly commits to the discretion of the District of Columbia Department of Corrections the operation of the Lorton facility.... District of Columbia prisoners are not to be equated with federal prisoners, nor are their rights necessarily the same." *Id.* at 930–31.

**31.** They are, of course, bound by general constitutional limitations. Moreover, the Attorney General is free to refuse to place federal prisoners there, just as he may refuse to enter into a contractual agreement with any other non-federal facility.

**32.** The necessity for Congressional approval of the District budget continues today. Congress rejected a proposed delegation of full fiscal authority to the District when enacting the Home Rule Act. Instead, it retained the budgetary structure established by the 1967 reorganization plan. Under this plan, the District is prohibited from obligating or expending revenues without obtaining the prior approval of Congress, and all revenues must be expended in the manner specified in that approval. However, District officials formulate the budget.

government which proposes the allocations of money in that budget for the various departments and agencies and, conversely, decides which agencies must undergo reductions in personnel and funds. Thus in 1980, District officials proposed the personnel cuts in Lorton operations.[33] When they testified in support of those cuts, they compared their situation specifically to that of state correctional administrators.[34] It bears remembering that levels of inmate supervision in correctional facilities like Lorton are largely dependent on ratios of guards to inmates and the budget authority to hire such guards.

 In sum, we have not been presented with, nor have we been able to find, any evidence that Lorton's statutory or legal relationship to the federal government differs from that of other District of Columbia agencies. In the absence of such a distinction, we would be hard-pressed to deviate from the general rule that the District of Columbia and its agencies are not federal agencies for the purposes of the FTCA.[35]

### 2. The "Contractual" Relationship Between Lorton and the Federal Bureau of Prisons

 In *Logue,* a contract defined the division of responsibility between the state and federal jailers. By contrast, no contract between Lorton or the Department and the Bureau or other federal agency acting on behalf of the Attorney General exists regarding the care of federal prisoners housed at Lorton. The appellant argues that this difference forecloses a holding that Lorton, like the Nueces County jail, is an independent contractor with the United States for the purposes of the FTCA. We find this argument meritless because the statutory and regulatory restraints on federal control over Lorton are the functional equivalent of the contract in *Logue.* The statutory authority for sending prisoners to state or local-run and District-run institutions is identical;[36] financial arrangements for the care of the United States Code offenders housed there are similar;[37] and

The Mayor (in 1974 the Commissioner) is required to submit an annual budget message to the Council along with a "multiyear" plan. The Council then has 50 days to enact an annual budget; the Mayor has a line-item veto, which in turn can be overridden by a two-thirds vote of the Council. *See* Newman & DePuy, *Bringing Democracy to the Nation's Last Colony: The District of Columbia Self-Government Act,* 24 Am.U.L.Rev. 537, 593–94 (1975).

**33.** *See 1981 Appropriations, supra* note 2, at 1371–88, 1403.

**34.** *Id.* at 3, 1400.

**35.** This court has uniformly held that the FTCA does not, as a general rule, render the United States liable for the torts of employees or agencies of the District of Columbia because the District of Columbia is an independent political entity. *See, e. g., Husovsky v. United States,* 590 F.2d 944, 952 (D.C.Cir.1978) (liability of United States under FTCA arose from extent of control and supervision exercised by its employees over land involved, not negligence of District employees exercising concurrent responsibilities); *Harbin v. District of Columbia,* 336 F.2d 950, 952 (D.C.Cir.1964) (Congress "consciously excluded" District of Columbia from the provisions of the FTCA); *Urow v. District of Columbia,* 316 F.2d 351, 352 n.2 (D.C.Cir.), *cert. denied,* 375 U.S. 826, 84 S.Ct. 69, 11 L.Ed.2d 59 (1963) (same). *But see God-*

*dard v. District of Columbia Redevelopment Land Agency,* 287 F.2d 343 (D.C.Cir.), *cert. denied,* 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed.2d 235 (1961) (Land Agency primarily devoted to pursuing national interests a federal agency for purposes of FTCA). *Harbin* and *Urow* were decided before the passage of the Home Rule Act. Their rationale is of course strengthened by the passage of that Act; however, we do note that Cannon's injury occurred prior to the effective date of the Home Rule Act.

**36.** *See* 18 U.S.C. §§ 4002, 4082, 5003.

**37.** The United States proferred at trial evidence that the accounting procedures and bases for the fees assessed by statute against the United States are "identical between the District of Columbia Department of Corrections and the Federal Bureau of Prisons [with those for prisoners the FBOP sends] to state institutions." Tr. 4/11/79 at 67. The appellee contended that the only reason no formal contract embodied those terms in the case of District of Columbia prisoners was that none was necessary: "We have, as a matter of practice, policy, and by our own internal interpretation of various statutes, considered that there is a contract between the District of Columbia Department of Corrections and the Federal Bureau of Prisons." *Id.* at 68.

federal requirements as to the care and treatment of federal prisoners at Lorton are, if anything, less intrusive.[38]

Lorton houses three classes of prisoners: those sentenced by the District of Columbia courts for District of Columbia Code offenses, a group with which we are not concerned here; those sentenced by the United States District Court for District of Columbia Code offenses, such as Cannon;[39] and those sentenced by the United States District Court for general federal crimes. Although 24 D.C.Code § 425 "commit[s] ... to the custody of the Attorney General" all three types of prisoners, and additionally gives him the power to transfer these prisoners to other "available, suitable, and appropriate institutions," the federal government differentiates between the latter two groups of prisoners for fiscal purposes. Lorton receives a per diem allowance, based upon an allocation of the facility's actual operating costs,[40] for each federal prisoner charged or convicted of a general federal offense that it houses. No difference appears to exist between this arrangement and those the Bureau makes for the care of federal prisoners in state-run institutions. The District is financially responsible for the upkeep of all District of Columbia Code offenders, including Cannon; a statute assesses the District in a similar fashion for costs incurred by the federal government in housing District of Columbia Code offenders in federal penal institutions.[41]

38. Approximately 4,955 federal prisoners, or 20% of the total population in federal custody, are housed in contract facilities. United States Dept. of Justice, Federal Prison System, Statistical Report: Fiscal Year 1975, at 6–7, 17 (1975). Most of these prisoners are pre-trial detainees, like Logue, convicts serving short sentences, or convicts nearing the end of their sentences who have been placed in halfway houses to ease their readjustment into society. *See* United States Dept. of Justice, Federal Prison System, Federal Bureau of Prisons 1975, at 12 (1975). The Bureau has established performance standards that nonfederal facilities must meet in order to qualify as boarding facilities for federal prisoners. Though these standards nominally distinguish between long and short-term prisons or pre-trial detainees, as Logue was, in fact those for each group are virtually indistinguishable. *Compare* Federal Prison System, Policy Statement: Contract Correctional Services—Long Term Service of Sentence in Non-Federal Facilities (Boarding), No. 30004 (Jan. 1, 1978) *with* Federal Prison System, Policy Statement: Contract Detention Services—Detention and Short-Term Service of Sentence in Non-Federal Facilities (Jails), No. 30002 (Jan. 1, 1978).

39. Before the Court Reform Act, District of Columbia offenders convicted of District of Columbia Code felonies, such as Cannon, were often tried in the federal district courts but sentenced to Lorton. Now that the District of Columbia Superior Court has exclusive jurisdiction of cases involving District of Columbia Code offenses, the federal district court judges sentence offenders appearing before them to Lorton much more rarely. *See 1981 Appropriations, supra* note 2, at 1403 (referring to 1972 agreement of district court judges not to sentence United States Code offenders to District correctional facilities).

40. The relevant section of the D.C.Code provides:

§ 24–446. Cost of care and custody of persons confined in institutions.

The cost of the care and custody of persons confined in the said institutions charged with or convicted of offenses under any law of the United States not applicable exclusively to the District of Columbia shall be charged against the department or agency of the United States primarily responsible for the care and custody of such persons in quarterly accounts to be rendered by the Disbursing Officer of the District of Columbia. The amount to be charged for such care and custody shall be ascertained by multiplying the average daily number of such persons so confined during the quarter by the per capita cost for the same quarter for all prisoners in the institution where confined, excluding expenses of construction or extraordinary repair of buildings. The sum so derived shall be credited to the current appropriation for the maintenance and operation of such institutions. (June 27, 1946, 60 Stat. 321, ch. 507, § 6.)

41. This section of the D.C.Code provides:

§ 24–424. Cost of care of District of Columbia convicts charged against District—Accounts.

The cost of the care and custody of District of Columbia convicts in any federal penitentiary shall be charged against the District of Columbia in quarterly accounts to be rendered by the disbursing officer of said penitentiary; and the amount to be charged against the District of Columbia shall be ascertained by multiplying the average daily number of District of Columbia convicts confined in the penitentiary during the quarter by the per capita cost for all prisoners in

The same regulations govern the commitment of federal prisoners to Lorton as to "contract" facilities. The applicable regulations require the Bureau to provide "suitable quarters for, and safekeeping, care and subsistence of," as well as "protection, instruction, and discipline" of "*all* persons charged with or convicted of offenses against the United States." (Emphasis supplied.) [42] The Bureau conducts periodic examinations of state and local facilities to ensure that they meet the Bureau's standards for "suitability," although neither their regulations, contracts, nor internal policies provide for Bureau monitoring of the day-to-day programs and activities of these non-federal facilities.[43] The Bureau, on the other hand, does not conduct any inspections of Lorton, on the basis of its belief that even this minimal intrusion would interfere with the power of supervision delegated by statute to the Mayor of the District of Columbia.[44] Thus, the Bureau of Prisons' and the Attorney General's control of Cannon's jailers is even more attenuated than that found insufficient to establish federal liability under the FTCA by the Court in *Logue.*

That this division of responsibility is established by statute rather than contract is irrelevant, insofar as liability under the FTCA is concerned. It effectively ensures that Lorton is no more under the day-to-day control of the federal government than are contracting state and local facilities.[45]

### 3. The Actual Relationship Between Lorton and Federal Authorities

The affidavit of the Acting Director of the Bureau of Prisons stated unequivocally: [46]

As the agency acting on behalf of the authority of the Attorney General with regard to the confinement of prisoners in the custody of the Attorney General this office does not exercise supervisory, management or monitoring control over the operation of the District of Columbia's Lorton Reformatory. In order to exercise a degree of power commensurate with the Attorney General's responsibility for the safekeeping of federal prisoners, whether sentenced pursuant to the D.C. Code or the U.S.Code, this office would have to conduct periodic program and management audits, direct the actions of, appoint and terminate employees, issue,

---

such penitentiary for the same quarter but excluding expenses of construction or extraordinary repair of buildings. (Mar. 3, 1915, 38 Stat. 869, ch. 75, § 1.)

It is worth noting that both statutory provisions clearly distinguish between federal and District of Columbia institutions.

**42.** *See* 28 CFR §§ 0.95(b)–(c).

**43.** *See Logue v. United States, supra,* 412 U.S. at 530, 93 S.Ct. at 2220, *see generally* Tr. 4/11/79 at 69–70.

**44.** *See* R. 10 (Defendant's Exhibit No. 9) (affidavit of Clair Cripe); Tr. 4/11/79 at 69–70. This failure to inspect was not cited as evidence of negligence on the part of FBOP officials; it may be partially explained by the fact that the FBOP does not place or transfer to Lorton United States Code offenders sentenced to more than one year in prison unless they specifically request such a placement. *See* Federal Prison System, Program Statement No. 5100.1 CN–2 § 12(M) (July 14, 1980). Nor did the appellant claim that appellee was negligent in designating Lorton as his place of confinement. Indeed, he requested such a placement. Thus, we do not have cause, as the Court did in

*Logue,* to remand this case for further findings of fact on whether negligence was involved in the FBOP's transfer of Cannon to Lorton. We decide only the question of the federal government's responsibility for the alleged negligence of Lorton employees in failing to provide adequate supervision while he was there.

**45.** In fact, the statutory basis of the District-federal relationship probably makes it more immutable than the contractual basis of the state-federal relationship in this area. At least one critic of the *Logue* decision has pointed to the relative ease with which the Bureau might alter its contractual terms to acquire day-to-day supervision of federal prisoners. *See* Note, *The Supreme Court and the Tort Claims Act: End of an Enlightened Era?* 27 Clev.St.L.Rev. 267, 285 (1978). To change the statutes involved in this case would be a complicated process, requiring the consent of Congress and, in some cases, the Mayor and Council of the District as well.

**46.** R. 10 (Defendant's Exhibit No. 9 at 2) (affidavit of Clair Cripe).

and monitor implementation of such regulations deemed necessary to manage such facilities, and require the submission of continuing reports regarding the progress of individual offenders and the management of these penal facilities. It is the understanding of this office that the provisions of 24 D.C.Code 441 and 442 precludes this office or the Attorney General from exercising any management control over the actions of the District of Columbia Department of Corrections as it regards the operation, classification and treatment of offenders contained within the penal facilities of that entity.

The District of Columbia Department of Corrections official in charge of Lorton was equally adamant as to the lack of federal interference in Lorton's affairs. He testified at trial that the Attorney General does not supervise the day-to-day treatment of any inmates incarcerated there, and that the federal government neither issues guidelines regarding the operational management or daily activities of that institution nor even provides "minimum" standards that must be met in caring for federal prisoners.[47]

In view of this record and the total lack of contrary evidence, we conclude that the actual relationship between the federal government and Lorton is as described in statute and case law: the functional equivalent of the "contractor" relationship that exists between the federal government and a state or county facility in which it lodges prisoners.

### 4. The *Close* Case and Other Precedents

Finally, appellant relies on several statutes and prior cases dealing with various aspects of the District-federal relationship, acknowledgedly a *sui generis* one, to provide a basis for bringing Lorton prisoners

sentenced in a federal court under the Act. The most important precedent he cites, and upon which the district court relied in denying the appellee's motion to dismiss, is this court's decision in *Close v. United States*, 397 F.2d 686 (D.C.Cir.1968). That case held that a federal prisoner injured through the negligence of his custodians at the District of Columbia Jail could sue the United States under the FTCA. In *Close*, decided both before *Logue* and the advent of the Home Rule legislation,[48] the court "surmised," despite an affidavit from a Bureau official attesting that the District of Columbia Jail was not under the jurisdiction of the federal government, that the Attorney General's acknowledged *legal* custody over the prisoner meant "it must be true or at least it does not appear from the record to the contrary that, as to this federal prisoner, the Attorney General had some degree of power, commensurate with his continuing responsibility, to supervise the D.C. jailer in his handling of this particular prisoner." 397 F.2d at 687 & n.2. However, the *Close* case was decided before the Supreme Court definitively held in *Logue* that the federal government must have actual control over the *physical* conduct of prison employees engaged in the supervision and treatment of a prisoner at the time the injury occurred, not merely the *legal* authority to designate the place of his confinement, in order to hold it liable under the FTCA. Logue, like Cannon, had been committed to the custody of the Attorney General; yet the Court found that legal control insufficient to invoke liability in light of the state jailer's control over the way in which the prisoner's day-to-day supervision and care were carried out. This court is no longer free, especially in view of the contrary evidence contained in this record,[49] to surmise that the legal control existing in *Close* and in this case necessarily gives rise

---

**47.** Tr. 4/6/79 at 238–40 (testimony of Marion Strickland).

**48.** The *Logue* opinion distinguishes *Close* in a footnote on the basis of the "findings of control by the Government that are contrary to the determination of the Court of Appeals in this case." 412 U.S. at 532 n.8, 93 S.Ct. at 2222 n.8. The Court also noted that the Government had

not raised the contractor defense against the FTCA claim. *Id.* The court of appeals explicitly stated that "[i]t is not claimed that the D.C. Jail is a contractor of the Federal Government within the meaning of the contractor exception of the FTCA." 397 F.2d at 687.

**49.** See text at notes 23–47 *supra*.

to the physical control deemed essential in *Logue* to accrue liability under the FTCA. To the extent *Close* holds that an actual demonstration of federal control over day-to-day supervisory operations of the prison is unnecessary for FTCA liability for injuries to prisoners in the legal custody of the Attorney General, we believe it has been superseded by *Logue*.[50]

█ The other cases cited by the appellant, which hold that the Attorney General has the power to determine furlough regulations for Lorton,[51] and that Lorton prisoners sentenced in United States district court have federal habeas corpus rights[52] are also inapposite, as those holdings arise from the power of a federal court to ensure that the custodians of persons it sentences are not violating their constitutional rights and from the undisputed legal custody of the Attorney General over all District of Columbia prisoners and his statutory right to transfer them at his will.[53] That legal custody, as we have said, no longer suffices as

50. There may be circumstances in which the federal government assumes physical as well as legal control over a federal prisoner incarcerated in a non-federal prison. The government may be responsible for making special arrangements for a prisoner, *see Logue v. United States, supra* (deputy marshal may be responsible for arranging special surveillance of a suicidal prisoner), or the government may place such detailed conditions and terms on the incarceration of federal prisoners in non-federal institutions that it can be said that the non-federal employees are acting "on behalf of a federal agency" when fulfilling those terms and conditions. The court in *Close* may have been alluding to such a situation when it spoke of the Attorney General's "power . . . to supervise the D.C. jailer in his handling of this particular prisoner." 397 F.2d at 687. However, no such special circumstances were presented to this court in this case.

51. *See* Appellant's Reply Brief at 2. This court upheld the Attorney General's power to issue the furlough regulations contained in 28 C.F.R. § 0 (Appendix to Subpart Q) in *Milhouse v. Levi*, 548 F.2d 357 (D.C.Cir.1976).

52. *See* Appellant's Reply Brief at 2; *McCall v. Swain*, 510 F.2d 167 (D.C.Cir.1975) (holding habeas corpus jurisdiction exists in the district court). *But see Swain v. Pressley*, 430 U.S. 372, 97 S.Ct. 1224, 51 L.Ed.2d 411 (1977) (holding that D.C. prisoners sentenced in local courts after the effective date of the Court Reform Act of 1970 do not have federal habeas corpus rights despite the fact that they are committed to the legal custody of the Attorney General).

53. It is well established that legal custody is not co-extensive with physical control over the day-to-day supervision of the prisoner; the former " ' . . remains in the Attorney General even though the prisoner is assigned to an institution over which the Department of Justice has no control.' " *Milhouse v. Levi, supra*, 548 F.2d at 362 (*citing Frazier v. United States*, 339 F.2d 745, 746 (1964)). Thus, a prisoner is considered to have escaped "from the custody

of the Attorney General" within the meaning of the federal escape statute, 18 U.S.C. § 751, even if he in fact absconds from a state-operated facility into which he was placed at the order of the Attorney General. State officials are often considered "officers of the Federal government" for some purposes when acting to fulfill the Attorney General's obligations arising from his assumption of *legal* custody. *See, e. g., Randolph v. Donaldson*, 13 U.S. 76, 9 Cranch 76, 3 L.Ed. 662 (1815); *Reid v. Covert*, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352 (1956), *rev'd on other grounds on rehearing*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957).

In *Milhouse*, this court upheld the authority of the Attorney General to set furlough guidelines for prisoners in Lorton Reformatory. It did so on the basis of his acknowledged statutory power to designate the place of confinement for all District prisoners, federal and local, under 24 D.C.Code § 402, as well as his legal "custody" over all such prisoners during their incarceration. In addition, it relied on his power to initiate furlough programs under 18 U.S.C. § 4082(c)(1), interpreted since its enactment to cover furlough programs at Lorton as well as federal institutions. The *Milhouse* opinion, however, went out of its way to emphasize that it saw no inconsistency between furlough power in the Attorney General and local regulation of the "facility's rehabilitation programs," citing the several unsuccessful attempts in Congress to transfer management control of Lorton from District to federal control. *Milhouse's* reasoning, we believe, can and should be limited to control over furloughs or other changes in places of confinement and should not cast any doubt on the District of Columbia Department of Corrections' continued and undisputed control over the programs and conditions of confinement in its institutions.

Similarly, in *McCall v. Swain*, 510 F.2d 167 (D.C.Cir. 1975), this court decided that the United States District Court for the District of Columbia had jurisdiction over the habeas corpus petition of a petitioner convicted in that

either an independent basis for jurisdiction under the FTCA or as a basis for inferring the kind of day-to-day custodial control that *Logue* demands for such jurisdiction.

### CONCLUSION

Thus we conclude that Cannon sued the wrong government here; it is the District of Columbia, his immediate jailer, from whom he should have sought redress for his injuries allegedly suffered as a result of his jailers' negligence while a prisoner at Lorton. The case is accordingly remanded to the district court for entrance of an order dismissing the action for failure to state a claim under the FTCA.

*Remanded.*

court of local crimes and confined in Lorton Reformatory. In holding that state officials acting as custodians of prisoners sentenced in federal court would be considered "Federal officers or employees" within the meaning of 16 D.C.Code § 1901, *id.* at 180, for habeas corpus purposes, it "emphasized" that the mere fact that a federal prisoner is incarcerated in a prison "committed to operation by local officials" has no effect on his right to return to a federal court for consideration of constitutional rights. It also "emphasized" that it was "addressing only those cases in which remedy by way of habeas corpus is proper." *Id.* at 181 n.38.

As for the much quoted language in *Randolph v. Donaldson, supra,* that Lorton was a "jail of the United States," 9 Cranch at 85–86,

the Court there actually held that the federal marshal was *not* responsible "for the escape of a prisoner regularly committed to the custody of the keeper of a state jail[.]" *Id.* Relying on the "doctrine of the common law applicable to the case of principal and agent," *id.,* the Court concluded the Virginia "sheriff . . . has the supervision and control of all the prisoners within the jail; and, therefore, is justly made responsible by law for all escapes occasioned by the negligence or willful misconduct of his underkeeper." *Id.* Thus, long before either *Logue* or the enactment of the FTCA, the Court held that in actions bottomed on negligence, the federal government could not be considered responsible for the negligence of local prison officials if it lacks physical control over their activities.