Sandra G. **LIMO**, Plaintiff,

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 92–1831.

United States District Court, District of Columbia.

May 27, 1994.

Patrick M. Regan, Koonz, McKenney, Johnson & Regan, Washington, DC, J. Philip Kessel, Ronald A. Karp, Chaikin & Karp, Rockville, MD, for plaintiff.

Madelyn E. Johnson, Asst. U.S. Atty., Washington, DC, Brian J. Nash, Wharton, Levin, Ehramtraut, Kelin & Nash, Bethesda, MD, for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court is defendant Paul Pevsner's motion for summary judgment which asserts that Dr. Pevsner is entitled to immunity from liability under the Federal Tort Claims Act because at all times relevant to this action he was an employee of the federal government. After consideration of the entire record the Court denies defendant Pevsner's motion.

### I. *Background*

On April 15, 1988, plaintiff underwent an operation to embolize a spinal arteriovenous malformation ("AVM") performed by Dr. Pevsner at Walter Reed Army Medical Center ("Walter Reed"). Plaintiff Sandra Limo alleges that as a result of negligence during the procedure she was rendered a paraplegic. After plaintiff brought suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671 *et seq.*, the United States filed an answer asserting that Pevsner, a civilian doctor, was an independent contractor. The United States also filed a third-party complaint against Dr. Pevsner for indemnification and contribution. Plaintiff later amended her complaint to add Dr. Pevsner as a defendant.

■ Defendant Pevsner now seeks summary judgment, claiming that he is immune from common law tort liability because at the time of the embolization he was an employee of the United States acting within the scope of his employment.[1] Pevsner directs the Court's attention to *Spinrad v. United States*, No. 85–0502 (D.D.C. January 30, 1986), in which another judge of this Court

---

**1.** Pevsner claims immunity under combined authority of the FTCA and the Gonzales Act, 10 U.S.C. § 1089. The Gonzales Act makes the FTCA the exclusive remedy for personal injury resulting from the negligence, wrongful act, or omission of any armed forces physician.

concluded that Dr. Pevsner was an employee of the United States.[2]

The United States responds that *Spinrad* is not controlling in the instant case because the status of Dr. Pevsner has changed in two material ways since that decision. At the time of the *Spinrad* embolization, Dr. Pevsner was a principal investigator in a research protocol being conducted at Walter Reed.[3] The *Spinrad* court concluded that the United States had the level of control over the operation that indicated Dr. Pevsner was an employee for purposes of the FTCA. The United States contends that because the protocol formally ended on October 9, 1985, Pevsner's status since then was no longer that of employee. In addition, Pevsner's activities at Walter Reed have been governed since 1985 by a series of contracts specifically acknowledging he was not an employee.[4]

In considering defendant Pevsner's motion, the Court is required to address two questions. First, we must determine what "control test" should be used in this jurisdiction to determine whether medical professionals, who must exercise some degree of independent judgment, qualify as employees. Second, the Court must decide whether Dr. Pevsner is entitled to employment status under the control test we adopt. The Court deals with each question separately.

## II. *Analysis*

Under the FTCA, the United States is liable for

> personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment.

28 U.S.C. § 1346(b). Employment, for purposes of the FTCA, is defined broadly. The definition includes

---

**2.** *Spinrad* also involved the AVM embolization procedure.

**3.** Under the protocol, Dr. Pevsner performed the procedure "in conformity with a detailed protocol contained in an Application for Clinical Investigation Project." *Spinrad*, p. 5.

**4.** The contract in force at the time of Ms. Limo's operation was signed February 16, 1988. *See* Ex. D.

---

officers or employees of any federal agency ..., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation ... but does not include any contractor with the United States.

28 U.S.C. § 2671.

### A. *Proper Test for Determining Employment/Contractor Status.*

■ The Supreme Court developed the control test to determine whether or not a party is a government employee. *See Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973); *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976). The distinction between contractor and employee turns on the absence of authority to control physical conduct. *Logue,* 412 U.S. at 527, 93 S.Ct. at 2219. The United States may still fix specific conditions to implement federal objectives and can require compliance with federal standards without transforming contractors into employees. *Orleans,* 425 U.S. at 815, 96 S.Ct. at 1976.

The control test has been applied uniformly by the Circuits in non-professional cases. *See Cannon v. United States,* 645 F.2d 1128 (D.C.Cir.1981) (case determining federal control over District of Columbia prison officials). Concerns have been raised that under too strict a test of control no physician would qualify as an employee because all doctors must exercise professional judgment. *See Lurch v. U.S.,* 719 F.2d 333, 337 (10th Cir. 1983), *cert denied* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984) (noting this in dicta). This concern prompted the 7th Circuit to adopt a "modified control test" in cases involving Veteran's Administration ("VA") physicians.[5] *Quilico v. Kaplan,* 749 F.2d 480, 485 (1984).

---

**5.** *Quilico* concluded that Congress intended that VA physicians be free to exercise their medical judgment and skill. *Id.* at 484–85. Whether this test would apply outside the VA setting is unclear.

Defendant Pevsner urges us to adopt the modified test. *Quilico,* however, does not explicitly define what factors should be considered in such a modified test. Such vagueness is unhelpful, and the Court questions the practical difference between approaches. As noted by the 10th Circuit in *Lilly v. Fieldstone,* 876 F.2d 857, 859 (10th Cir.1989), the "modified control test" label lacks practical significance because the control test is always subject to the physicians' medical and ethical obligations.

> What we must do in the case of professionals is determine whether other evidence manifests an intent to make the professional an employee subject to other forms of control which are permissible. A myriad of doctors become employees by agreement without surrendering their professional responsibilities.

*Id.* We agree that physicians can be employees under the control test and therefore apply this test to the case at hand.

B. *Determination of Dr. Pevsner's Status.*

In applying the control test to the case before us, the Court looks to the contract between the parties for evidence of Dr. Pevsner's status. *Wood v. Standard Products Co.,* 671 F.2d 825, 829 (4th Cir.1982) ("the contract and its terms in fixing the relationship of the offending party are critical"); *see also MacDonald v. U.S.,* 807 F.Supp. 775, 779 (M.D.Ga.1992). Since 1985, considerably after the period at issue in the *Spinrad* case, Dr. Pevsner's status at Walter Reed has been governed by a series of contracts. *See* opposition, Ex. D, F. The identical provision in each contract states:

> CONTRACTOR'S RESPONSIBILITY: The Contractor acknowledges he is not an employee of the Government and that he must carry personal liability coverage at a level appropriate for the type of service being contract [sic] for and the geographical location.

Contracts, p. 4, ¶ 6. The term "contractor" is used throughout the contracts. In addition, payment was contingent upon the prop-er submission of invoices. Contracts, p. 4, ¶ 7.

This raises two additional factors for the Court to consider, liability insurance and method of payment. Defendant Pevsner was required to carry his own malpractice insurance. Pevsner Affidavit, p. 2; *see Broussard v. U.S.,* 989 F.2d 171, 175–76 (5th Cir.1993). Pevsner was not hired by Walter Reed in the normal manner of an employee, and he was entitled only to a regular fee of $360 per embolization. *See* Ex. G. Pevsner had no regular hours at Walter Reed, maintained a private practice elsewhere, and had no office at Walter Reed.[6]

Also missing from the contract were any provisions designed to control the manner of performance by the physician. *Wood,* 671 F.2d at 830. As noted previously, the detailed requirements contained in the protocol in force prior to 1985 were no longer in place by the time of Ms. Limo's operation in 1988. Instead, Pevsner argues that the "non-research" aspects of the protocol continued after the protocol was officially concluded because the hospital continued to do things "exactly the same way." Reply, p. 10 (*citing* George Deposition, p. 54). However, the protocol involved detailed informed consent process, record keeping, and data analysis. The procedure in *Spinrad* required individual approval through the Department of Clinical Investigation and the Office of the Surgeon General because at that time the embolization procedure was considered experimental. *See* opposition, Ex. 4; *see also* Ex. C. No specific outside authorization was required by the time of Ms. Limo's operation.

After 1985, patients were chosen by a group of physicians including Dr. Pevsner and Dr. George, the department chairman. George Deposition, pp. 78–79. This group operated by consensus and Dr. George considered Pevsner a "peer". *Id.* at 79. In fact, the record indicates that Dr. George had never actually performed the type of embolization routinely handled by Pevsner, and on many occasions Dr. George was not even present during the procedure. Dr. Pevsner

---

6. Dr. Pevsner used the office of the department chairman during his visits to Walter Reed.

was qualified to perform the operation alone.[7] George Deposition, pp. 10–11.

█ The Court concludes that if the procedures of the terminated protocol were still generally followed, they no longer amounted to explicit procedural guidelines indicating direct government control, and had instead become general standards and guidelines fully compatible with independent contractor status. *See Carrillo v. U.S.*, 5 F.3d 1302, 1304 (9th Cir.1993) (contractor/physician subject to same rules, regulations, and hospital control as military physicians) (*citing Lilly*, 876 F.2d at 860). Taken as a whole, it appears clear that the United States did not have the degree of control over Dr. Pevsner's conduct during the Limo procedure to transform his status to that of employee despite the clear terms of his contract.

### III. *Conclusion*

Defendant Pevsner's status changed dramatically during the time since the *Spinrad* decision. His work at Walter Reed in 1988 was governed by a contract that disavowed any right to employment status. In addition, embolizations were no longer governed by the detailed procedural requirements of the research protocol. Consequently, Dr. Pevsner was an independent contractor for purposes of the FTCA.

An order in accordance with this opinion has been issued this date.

### ORDER

Upon consideration of defendant Pevsner's motion for summary judgment because of immunity from personal liability, the opposition and replies thereto, and the entire record of this case, it is this 27th day of May, 1994, hereby

ORDERED that defendant Pevsner's motion for summary judgment is denied.

---

7. This differs from the procedure followed during the protocol, where "every patient was seen by multiple people so there would not be one person making [the] decision." George Deposition, p. 11.