Charles QUILICO, Plaintiff-Appellant,

v.

Sidney J. KAPLAN and Samuel Solomon, Defendants-Appellees.

No. 83–2013.

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 7, 1984.[*]

Decided Dec. 6, 1984.

As Amended Dec. 14, 1984.

Joseph Moscov, Waukegan, Ill., for plaintiff-appellant.

Dan K. Webb, U.S. Atty., Chicago, Ill., for defendants-appellees.

Before ESCHBACH, POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

The issue raised in this appeal is whether physicians and surgeons appointed to the Veterans Administration Department of

---

[*] After preliminary examination of the briefs, the court notified the parties that it had tentatively concluded that oral argument would not be helpful to the court in this case. The notice provided that any party might file a "Statement as to Need of Oral Argument." See Rule 34(a), Fed.R.App.P.; Circuit Rule 14(f). No such statement having been filed, the appeal has been submitted on the briefs and record.

Medicine and Surgery on a temporary basis under the authority of 38 U.S.C. § 4114 are exempt from personal liability under 38 U.S.C. § 4116 for malpractice arising from the performance of their services for the Veterans Administration ("VA"). The district court held that the defendant physicians and surgeons, appointed to the Department of Medicine and Surgery of the Veterans Administration pursuant to section 4114, are exempt from personal liability under section 4116. We affirm.

The defendants, Drs. Kaplan and Solomon, are physicians and surgeons appointed to the VA Department of Medicine and Surgery under the provisions of 38 U.S.C. § 4114. Physicians and surgeons receiving appointments pursuant to section 4114 are assigned to the Department of Medicine and Surgery for a fixed period of time and are not considered permanent employees. The defendant physicians, as consulting physicians for the VA, treated the plaintiff from August 1979 to August 1981 at a local VA hospital and at Dr. Solomon's office on three occasions. The treatment given to Quilico during the office visits was part of his overall treatment program originally commenced at the VA hospital. In November of 1982, the plaintiff brought an action against the defendants in the Circuit Court of Lake County, Illinois alleging that the defendants were negligent in providing medical care in failing to remedy or substantially control the plaintiff's dermatitis.

Three months after the defendants were served in the state action, the United States Attorney for the Northern District of Illinois filed a petition for removal of the action to the district court. The removal petition was filed in accordance with 38 U.S.C. § 4116 which directs the Attorney General to defend, as a suit brought under the Federal Torts Claims Act ("FTCA"), any suit against physicians, surgeons, and other medical personnel[1] for malpractice

liability in furnishing care or treatment "while in the exercise of such persons duties in or for the Department of Medicine and Surgery" of the VA. 38 U.S.C. § 4116(a), (b), (c). In the petition for removal, the United States Attorney certified that at the time of the alleged negligence the defendant physicians were acting within the scope of their duties as employees of the United States. In affidavits submitted in support of the removal petition, both doctors alleged that they had treated Quilico as part of their duties as consulting physicians with the VA hospital in North Chicago, Illinois. They further asserted that they were "controlled by Veterans Administration regulations and procedures" while practicing at the VA hospital. Dr. Solomon further stated in his affidavit that the Quilico treatment procedures at his office were nothing more than a continuation of the program of treatment commenced at the VA hospital. The plaintiff, Quilico, filed a motion in opposition requesting remand of the cause to the state court, claiming that the defendants were not employees of the United States but rather were independent contractors; thus, section 4116 and the FTCA were inapplicable as they only apply to employees of the United States government. The plaintiff also contended in his motion in opposition to the remand that "the allegations as to the quality of medical care afforded plaintiff in the instant case concern the services provided by the defendants primarily in their private office rather than facilities of the United States Veterans Agency [sic], and plaintiff provided compensation to the defendants for the complained of medical services at their private office."[2]

At a hearing on the motion to remand, the district court found that unquestionably the two physicians were acting within the scope of their duties as employees of the VA Department of Medicine and Surgery. The district court noted that the

---

1. The statute also immunizes dentists, podiatrists, optometrists, nurses, physician assistants, expanded-function dental auxiliaries, pharmacists, paramedicals, and support personnel. 38 U.S.C. § 4116(a).

2. Quilico does not renew his argument and, therefore, has abandoned his theory before this court that his injury was solely caused by treatment given during the office visits.

office consultations, following the original diagnosis and treatment at the VA hospital, were an integral part of the treatment program and were performed as part of the defendant physicians' employment by the VA in spite of the fact that the plaintiff was obligated to pay for two of the three office visits.[3] The district court concluded that the defendant physicians were immune from liability under section 4116 because the alleged malpractice occurred during the course of their employment with the VA. Accordingly, the district court denied the plaintiff's motion to remand to the state court and, at the same time, granted the defendants' motion to dismiss for failure to exhaust administrative remedies, a prerequisite for suits brought under the FTCA.[4] Quilico appeals from the dismissal of the action solely on the basis that the FTCA is inapplicable to these defendants because the defendants are merely independent contractors as contrasted with employees of the federal government. We note that Quilico does not contend in his pleadings or his argument that he has met the FTCA exhaustion requirement by filing an administrative claim with the VA.

## I. INDEPENDENT CONTRACTOR

 The plaintiff argues that to determine whether or not section 4114 physicians are immunized from liability under section 4116 we must apply the strict control test. Under this test, before the defendants may be considered government employees, it must be demonstrated that the government is authorized to direct or control the detailed performance of the defendants' work. *See United States v. Or-*

*leans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976); *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973). (In these cases the Court developed the strict control test to determine whether a person is an employee or an independent contractor under the Federal Torts Claims Act.) We, however, disagree that the strict control test is the proper method to determine whether physicians rendering service to the VA are to be considered employees for purposes of section 4116 immunity since such a test, because of the nature of a physicians' work, would severely curtail the immunity privilege for both temporary and permanent employee/physicians.

Title 38 U.S.C. § 4116(a) provides that: "The remedy against the United States provided by sections 1346(b) and 2672 of title 28 ... for damages for personal injury, including death, allegedly arising from malpractice or negligence of a physician ... in furnishing medical care or treatment while in the exercise of such person's duties in or for the Department of Medicine and Surgery [of the Veterans Administration] shall hereafter be exclusive of any other civil action or proceeding by reason of the same subject matter against such physician ... whose act or omission gave rise to such claim."

Section 1346(b) of Title 28 grants exclusive jurisdiction to the district courts in civil actions or claims against the United States for injuries "caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment...."[5]

---

**3.** To sustain his argument that his injury was solely caused by treatment given during the office visits, Quilico had to persuade the district court that his injury was solely caused by the office treatments rather than the course of treatment prescribed by the defendants when he first consulted them at the VA hospital. However, we note that in his complaint Quilico alleged injury from a course of treatment rather than an injury inflicted upon him as a result of the office visits.

**4.** The FTCA requires that when a suit is filed against an employee of the government for ac-

tions arising from their employment, the suit must initially be brought before the administrator of the program that employs that person.

**5.** Title 28 U.S.C. § 1346(b) provides in full:
"(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury

Section 1346(b) incorporates the section of the FTCA defining government employees as including officers and employees of "any federal agency" but excluding "any contractor with the United States." 28 U.S.C. § 2671.[6] Thus, we must analyze the cases interpreting the independent contractor exception to the FTCA to determine whether non-career physicians appointed to the VA Department of Medicine and Surgery under section 4114, on a temporary basis for a fixed period of time, as contrasted with physicians and surgeons appointed to the Department of Medicine and Surgery as full-time employees on a permanent basis, are immune from liability under section 4116.

In developing the strict control test for the independent contractor exception to the FTCA, the Supreme Court noted that the FTCA provides for, "a limited waiver of sovereign immunity, making the Federal Government liable to the same extent as a private party for certain torts of federal employees acting within the scope of their employment." *Orleans*, 425 U.S. at 813, 96 S.Ct. at 1975. As a waiver of sovereign immunity, the FTCA must be strictly interpreted and applied when granting relief. *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Whether the defendant is a government employee or an independent contractor under the FTCA is a question of federal law. *Logue*, 412 U.S. at 528, 93 S.Ct. at 2219. In *Logue*, the Supreme Court, in effect adopting the reasoning of the Restatement (Second) of Agency § 2 (1958),[7] held that when the relationship between the government and a person is fixed by contract, the distinction between an employee and an independent contractor turns "on the absence of authority in the principal to control the physical conduct of the [alleged employee] in [the] performance of the contract." *Logue*, 412 U.S. at 527, 93 S.Ct. at 2219. *See also Orleans*, 425 U.S. at 814, 96 S.Ct. at 1976.[8]

The ability of the VA Department of Medicine and Surgery to supervise and control temporary or permanent physicians and surgeons in the Department, however, is limited by the physician's ethical obligation to have "free and complete exercise of

---

or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

6. Title 28 U.S.C. § 2671 provides in full:
"As used in this chapter and sections 1346(b) and 2401(b) of this title, the term 'Federal agency' includes the executive departments, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States.
"'Employee of the government' includes officers or employees of any federal agency, ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.
"'Acting within the scope of his office or employment', in the case of a member of the military or naval forces of the United States ... means acting in line of duty."

7. Restatement (Second) of Agency § 2 (1958) provides that:
"(1) A master is a principal who employs an agent to perform service in his affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.
"(2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the master.
"(3) An independent contractor is a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent."

8. We note that the *Orleans* and *Logue* decisions did not entail an analogous factual situation involving a professional, such as a physician. The Supreme Court in *Orleans* (use of county jails for federal prisoners) and *Logue* (federal funding of a local community program) analyzed the degree of control that the federal government possessed over employees of an outside agency used by the federal government to render service in the community.

[their] medical judgment and skill. . . ."[9] Principles of Medical Ethics § 6, *reprinted in* Opinions and Reports of the American Medical Association Judicial Council, 5 (1977). *See also Lurch v. United States,* 719 F.2d 333, 337 (10th Cir.1983). Thus, it is apparent that medical ethics require a physician, whether temporarily or permanently appointed to the VA Department of Medicine and Surgery, under section 4114 or section 4104 respectively, to exercise independent judgment and, therefore, he or she cannot be strictly supervised or controlled by the VA within the meaning of the "strict control" test.[10]

Our conclusion that professionals such as physicians and surgeons may not be strictly controlled by their employer because of the necessity to fulfill their ethical obligation to exercise independent judgment in the best interest of their patients is supported by *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). In *Polk,* the plaintiff relied on a public defender's employment by a county to establish the "under color of state law" jurisdictional requirement for a section 1983 action. Rejecting the argument that public defenders "are subject to supervision by persons with interests unrelated to those of indigent clients," *id.* 454 U.S. at 321, 102 S.Ct. at 451, the Court found that the employer did not direct or control the actions of the public defender "when performing a lawyer's traditional functions as counsel to a defendant in a criminal proceeding," *id.,* 454 U.S. at 325, 102 S.Ct. at 453. The Supreme Court specifically noted the ethical obligation of the attorney to exercise independent judgment mandated by DR5-107(B), ABA Code of Professional Responsibility (1977), "A lawyer shall not permit a person who recommends, employs, or pays him to render legal services for another to direct or regulate his professional judgment in rendering such legal services." *Polk,* 454 U.S. at 321, 102 S.Ct. at 451. The Supreme Court concluded that public defenders, whose ethical obligations require them to exercise independent judgment, do not act under color of state law because they are not subject to governmental control. *Id.,* 454 U.S. at 327, 102 S.Ct. at 454 (Burger, C.J., concurring).[11] The point we draw from *Polk* is that, when a professional person such as an attorney or a physician and surgeon is required by a professional code of ethics to exercise his or her independent judgment in the best interest of his or her client or patient respectively, the professional may not be controlled by the employer. If the employer were to control the independent judgment in the decision-making process and the performance of the professional's duties, the employer's control might conflict with the professional's primary and unequivocal

---

9. One commentator has noted that the absence of governmental supervisory control over VA physicians has improved the quality of care given to veterans:

> "Medical practices have not been dictated by the central office but have been derived from their individual medical staffs. This policy has eliminated stifling regimentation and has permitted full academic freedom for physicians. Such autonomous development at the individual hospitals has utilized heavily the advice and guidance of consultants from the affiliated medical school, the local community or nearby medical center."

Cohen, *Medical Care: Its Social and Organizational Aspects—The Veterans Administration Medical Care Program,* 19 New Eng.J.Med., Nov. 7, 1963, at 1011.

10. We recognize that residents in training programs performing specific medical services may very well be considered under the direct technical and professional supervision and control of the staff. *See* Defense of Malpractice or Negligence Suits Against Collaborating Residents, General Counsel's Opinion 8–75, Veterans Administration (1975). However, the case at hand concerns fully trained physicians who are not under the supervision of a staff member.

This decision is not to be construed as conflicting with cases addressing liability of physicians employed under section 4117, as the issue of immunity as it relates to physicians employed under that section is not before us. *See, e.g., Lurch v. United States,* 719 F.2d 333 (10th Cir.1983).

11. In *Polk,* the Court distinguished *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) and *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), in which state-employed doctors were sued under section 1983 in their capacity as state custodians and administrators.

duty to exercise his or her independent judgment.

Quilico argues that we must limit section 4116 immunity to physicians whose job performance is subject to strict supervision and control by the VA Department of Medicine and Surgery. However, physicians and surgeons have an ethical obligation to exercise independent judgment that prevents the Department of Medicine and Surgery from strictly controlling or supervising the specific judgments made by the professional when performing surgery or providing other medical care treatment. Because both permanent and temporary physicians and surgeons appointed to the VA Department of Medicine and Surgery, under 38 U.S.C. §§ 4104, 4114 respectively, have an ethical obligation to exercise independent judgment that prevents the VA from strictly controlling their performance, we hold that the strict control test—governmental authority to control the professional's performance of his duties—is inappropriate in determining whether Congress intended that a section 4114 physician is to be immunized from liability by section 4116. If we were to adopt Quilico's argument that the strict control test is to be used in determining the scope of immunity under section 4116, almost all physicians and surgeons operating within the VA program who are sued for medical malpractice, including those permanently employed, would not be immune. Thus, anytime a physician or surgeon is called upon to exercise independent judgment, he or she would face the risk of liability. Since this obviously was not the intent of Congress in enacting section 4116, we hold that the strict control test is inapplicable in determining the scope of immunity for physicians under this section.

## II. CONGRESSIONAL INTENT

■ To resolve the question of whether non-career physicians and surgeons appointed to the VA Department of Medicine and Surgery are immunized from malpractice liability by section 4116, we must examine the congressional intent and the statutory scheme of Chapter 73 of Title 38 establishing the Department of Medicine and Surgery. As the Supreme Court instructed in *Rose v. Lundy:*

> " 'where the statute's language seem[s] insufficiently precise, the natural way to draw the line is in light of the statutory purpose.' ... 'The axiom that courts should endeavor to give statutory language that meaning that nurtures the policies underlying legislation is one that guides us when circumstances not plainly covered by the terms of a statute are subsumed by the underlying policies to which Congress was committed.' "

455 U.S. 509, 517–18, 102 S.Ct. 1198, 1203, 71 L.Ed.2d 379 (1982) (*quoting United States v. Bacto-Unidisk,* 394 U.S. 784, 799, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726 (1969) and *United States v. Sisson,* 399 U.S. 267, 297–98 (1970)).

Maintaining sufficient staffing levels at VA hospitals and obtaining the services of qualified specialists have long been problems for the Veterans Administration. *See, e.g.,* H.R.Rep. No. 93–368, 93 Cong., 1st Sess. (1973) *reprinted in* U.S.Code Cong. & Ad.News 1688, 1695–97. In 1945, while responding to allegations of poor care in the VA hospitals, Congress abolished the permanent medical staff which had staffed the VA hospitals up until that time and created the Department of Medicine and Surgery. 91 Cong.Rec. 11,656–70 (1945). The employees of the VA Department of Medicine and Surgery were divided into four categories: (1) directors; (2) doctors, dentists, and nurses who accept a career appointment to the Department of Medicine and Surgery; (3) permanent employees who are not doctors, dentists, or nurses; and (4) physicians, dentists and nurses who accept a temporary assignment to the Department of Medicine and Surgery under section 4114. *Id.* at 11,658. Provision was made for the appointment of non-career physicians because the cost of hiring full-time physicians to review the claims for compensation and pensions of World War II veterans was prohibitive, *id.* at 11,664, and, more importantly, because the VA was unable to compete financially with

the private sector for the services of specialists. *Id.* at 11,665. General Omar Bradley, the then Administrator of the VA, developed the finest medical plan possible for veterans when he proposed affiliating the VA hospitals with teaching hospitals and medical schools. Kracke, *Medical Care of the Veteran*, J.A.M.A., Aug. 12, 1950, at 1323. In order that the veterans could receive the finest medical care and treatment available in the country, the VA hospitals were placed near medical research centers and teaching programs where highly trained medical specialists could treat the veterans on a fee basis. 91 Cong.Rec. 11,657 (1945). The affiliation with teaching hospitals has assisted the VA in the recruitment of qualified physicians to the full-time, part-time, and visiting staffs of the VA hospitals. Numemaker, *The Veterans Administration—Medical School Relationship*, J.Med.Ed., Feb. 1959, at 77–82.

The academic environment existing in the VA hospitals by virtue of their medical school affiliations has enabled the VA to attract and retain a high quality professional staff. Musser and McClaughery, *The Affiliation of Veterans Administration Hospitals With Medical Schools*, J.Med. Ed., July, 1973, at 531–38. Musser and McClaughery found that, "[t]here is universal agreement that the American veteran now receives the highest quality of medical care.... The diligence and sustained interest of the medical schools, the conscientiousness of the attending and consultant physician, the excellence of the VA professional staffs, and the close working relationship between medical school and VA physicians constitute a solid foundation

which assures ... the high quality of services...." *Id.* at 532. Furthermore, the major health problems of the veteran population have been the focus of the VA medical research program. Armstrong, *The Medical Program of the Veterans Administration*, J.A.M.A., Oct. 3, 1959, at 544. The VA medical research program "not only provides the necessary solutions to the day-to-day problems of medical care but is of benefit to the nation and its non-veteran citizens as well. In addition, many medical specialists have been attracted by the opportunities for research and have joined the staffs of VA hospitals for this reason." *Id.* Non-career positions in the Department of Medicine and Surgery of the Veterans Administration are attractive to physicians and surgeons because they allow the physicians and surgeons the opportunity to practice and specialize in particularized fields of medicine or to conduct research. *Veterans Administration Medical Program: Hearings Before the Subcomm. on Hospitals of the House Comm. on Veterans Affairs*, 87th Cong., 2d Sess. 2078 (1962) (letter of W.J. Driver) ("Program Hearings").

Although prior to 1964 most malpractice suits involving the VA had been brought against the government rather than the physician, H.R.Rep. No. 782, 89th Cong., 1st Sess. 11 (1965), malpractice protection for VA physicians was proposed in 1964. H.R. 5923, 88th Cong., 1st Sess. (1964).[12] In its original form, the Bill would have allowed the Administrator of the Department of Medicine and Surgery to purchase malpractice insurance for VA physicians. *Id.* Congress chose instead to amend the FTCA. Pub.L. 89–311, § 6(a), Oct. 31, 1965, 79 Stat. 1154. The legislative history

---

12. H.R. 5923 provides in pertinent part:

"A BILL to amend section 234 of title 38, United States Code, to authorize the Administrator of Veterans' Affairs to procure liability insurance for personnel of the Department of Medicine and Surgery covering claims against them alleging malpractice

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That (a) section 234 of title 38, United States Code, is amended by inserting the subsection designation '(a)' im-

mediately before 'The Administrator', and by adding at the end thereof the following:

'(b) The Administrator shall pay the cost of insurance, with such limits of liability as he may deem appropriate, protecting physicians, dentists, and nurses of the Department of Medicine and Surgery against claims made against them alleging malpractice, or negligence in the furnishing of medical care and treatment, occurring while in the exercise of their duties in the Department of Medicine and Surgery.'"

of section 4116 indicates that it was the intent of Congress that the immunity granted to the VA physicians and surgeons be broad because the benefits of section 4116 coverage were seen as "an aid in the recruitment of much needed personnel." S.Rep. No. 92–776, 92nd Cong., 2d Sess. 51 (1972). It is obvious after reviewing the legislative histories of sections 4114 and 4116 that Congress in adopting this legislation was attempting to secure the services of the most qualified physicians and surgeons in their respective specialties in a particular geographical area and that immunity from liability was beyond all doubt intended as an inducement. Immunity from liability definitely is a substantial inducement in our litigious society of today. Since a grant of immunity under section 4116 to physicians and surgeons employed on a temporary basis for a fixed period of time under section 4114 furthers the section 4114 goal of improving the recruitment of the most qualified specialized medical personnel and the overall quality of medical care in VA hospitals, it was the obvious intent of Congress that those doctors recruited to serve on a temporary basis for a fixed period of time should also enjoy the immunity protection of section 4116. We hold that Congress intended to extend section 4116 immunity to all section 4114 physicians and surgeons operating in the VA program.

Furthermore, the history of the Department of Medicine and Surgery and the language of section 4116(b) demonstrate that Congress did not intend to limit the scope of section 4116 coverage only to the permanent employees of the Department of Medicine and Surgery. As our discussion of the creation of the VA Department of Medicine and Surgery clearly indicates, non-career physicians and surgeons have been considered an integral part of the Department since its creation in 1945. Significantly, § 4116 does not distinguish between tempo-

rary or career employees; rather, the statute lists "physician" in a lengthy list of persons covered. Furthermore, section 4116(b) requires the Attorney General to defend "*any person* referred to in subsection (a) of this section." (Emphasis added.) By broadly defining the persons covered by section 4116, Congress, which was cognizant that the Department of Medicine and Surgery was comprised of both temporary and career physicians and surgeons, did not intend for the scope of section 4116 immunity to be determined by whether the physician or surgeon seeking its protection was a career or temporary employee. Rather, the scope of section 4116 was limited by defining the types of acts covered [13] and by requiring that the suit be against a "defendant ... acting in the scope of such person's employment" for liability arising from "furnishing medical care or treatment while in the exercise of such person's duties in or for the Department of Medicine and Surgery."

In the instant case, the defendants were consulting physicians hired by the VA under section 4114. The district court found, and the record supports the district court's findings, that the defendant physicians were acting within the scope of their duties for the VA Department of Medicine and Surgery when they treated Quilico. We hold that because section 4116 immunizes section 4114 physicians, including these defendants, from malpractice in furnishing medical care for the VA Department of Medicine and Surgery, Quilico is limited to the relief provided by the FTCA.

The district court's decision dismissing this action for failure to exhaust the administrative remedies required by the FTCA is AFFIRMED.

---

**13.** Section 4116(a) extends coverage for acts of malpractice and negligence. Section 4116(e) protects "Department of Medicine and Surgery medical personnel who are assigned to a foreign country, or who are sued for assault and battery, false imprisonment, or libel and slander in connection with the performance of their assigned duties." S.Rep. No. 92–776, 92d Cong., 2d Sess. 51 (1972) (letter from Donald E. Johnson, Administrator of the Veterans Administration). *See also Lojuk v. Quandt,* 706 F.2d 1456, 1462–63 (7th Cir.1983).