**Annamma A. EZEKIEL and Al Ezekiel,
Plaintiffs–Appellants,**

v.

**Jaime T. MICHEL and United States of
America, Defendants–Appellees.**

No. 94–2838.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 7, 1995.

Decided Sept. 26, 1995.

Daniel E. May (argued), Office of the United States Attorney, Civil Division, Appellate Section, Chicago, IL, Linda A. Wawzenski, Asst. U.S. Atty., Office of the United States Attorney, Chicago, IL, for defendants-appellees.

Before BAUER, COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff Annamma Ezekiel, a nurse employed at the North Chicago Veterans Administration Medical Center (VA hospital), and her husband brought this tort action against Dr. Jaime T. Michel, a resident physician in psychiatry at the VA hospital. Ezekiel alleged that she was accidentally pricked by a contaminated hypodermic needle, which Dr. Michel had failed to properly cap or dispose of.[1] Finding that Dr. Michel was a federal employee acting within the scope of his employment at the time of the alleged negligent act, the district court substituted the United States as the proper defendant under the Federal Tort Claims Act (FTCA), *see* 28 U.S.C. § 2671, *et seq.,* and proceeded to dismiss the complaint for lack of subject matter jurisdiction. Fed.R.Civ.P. 12(b)(1). The court ruled that Ezekiel cannot maintain the suit against the United States under FTCA for she was a federal employee injured on the job, and her exclusive remedy is the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8116(c). The plaintiffs appeal from the dismissal of their complaint. We affirm.

## I. BACKGROUND

In July 1991, both Annamma Ezekiel and Dr. Michel were employed by the VA hospital in North Chicago, Illinois: Ezekiel was a nurse and Dr. Michel was a resident physician assigned to a psychiatric residency position. As will be explained more fully below, a resident physician must first complete his medical education, then pass the necessary medical examinations, and be licensed in Illinois to practice medicine before he can receive clinical training in a specialized field

Brian R. Holman, Jeffrey M. Friedman (argued), Friedman & Holman, Chicago, IL, for plaintiffs-appellants.

1. Alleging loss of consortium, Ezekiel's husband also sued Dr. Michel based on the same event.

such as psychiatry. On July 11, 1991, Ezekiel paged for a doctor to draw blood from a patient known to be infected with the hepatitis C virus and the human immunodeficiency virus (HIV). Dr. Michel responded to the page, and after drawing blood from the patient, failed to properly cap or dispose of the contaminated hypodermic needle. Instead, he placed the syringe on top of the empty needle cap on the table. Ezekiel's complaint alleges that when she attempted to dispose of the syringe as part of her duties as a nurse, both of her hands were pricked in several places by the exposed needle. Ezekiel was immediately tested for exposure to blood-borne contaminants, but her test results at that time were negative. More than two years later in November 1993, Ezekiel was diagnosed with hepatitis C. She has not tested positive for HIV.

At the time of Ezekiel's injury, Dr. Michel was in his last year of his medical psychiatric residency program under the auspices of the Chicago Medical School. Dr. Michel was a licensed physician in the State of Illinois, having graduated medical school, passed the necessary qualifying examinations, and been approved by the Medical Licensing Board.[2] In order to receive Board certification as a psychiatrist, Dr. Michel had enrolled in the accredited residency program of the Chicago Medical School to receive specialized training and experience. As part of the residency program, Dr. Michel was assigned to work at the VA hospital from July 1, 1991, through June 3, 1992. Although the VA hospital appointed Dr. Michel as a resident in psychiatry, he was not compensated directly by the VA hospital. According to the VA hospital's Chief of Human Resources Management, Robert Grant, residents may rotate through several hospitals as part of their training, but each facility contributes to a fund that pays the residents' salaries. Presumably, the fund is administered by the Chicago Medical School, the institution directing the overall residency program. Further, according to Grant, resident physicians receive specialized training and supervision under VA hospital staff and are considered employees of the VA hospital.

Initially, Ezekiel and her husband sued Dr. Michel in his sole capacity, alleging that his failure to properly handle and dispose of the contaminated hypodermic needle caused Ezekiel to contract hepatitis C, a serious and potentially life threatening disease. The plaintiffs purported to base their action on the parties' diversity of citizenship.[3] See 28 U.S.C. § 1332(a). The Government intervened under the FTCA and sought to have itself substituted for Dr. Michel as the defendant, relying on the Attorney General's certification that Dr. Michel was a federal employee acting within the scope of his employment at the time of Ezekiel's injury. See 28 U.S.C. §§ 2679(b)(1) and 2679(d)(1). The Government also sought dismissal of the complaint for lack of subject matter jurisdiction, see Fed.R.Civ.P. 12(b)(1), alleging that because the United States is the proper defendant and Ezekiel was a federal employee injured while performing her nursing duties, Ezekiel's action is precluded by the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8116(c). Alternatively, the Government argued that the plaintiff, Ezekiel, failed to exhaust her administrative remedies, which is a prerequisite to the filing of a tort claim against the United States under the FTCA. See 28 U.S.C. § 2675(a).

Initially, the district court concluded that Dr. Michel was not a federal employee and thus, the suit was not deemed an action against the United States. On reconsideration and based on further submissions by the government,[4] the court reversed its previous position and ruled that Dr. Michel was a federal employee at the time of Ezekiel's injury. The trial judge after reviewing the record was influenced by the degree of su-

---

2. *See* The Illinois Medical Practice Act, 225 ILCS 60/11(4), 60/17; R. at 14 (letter from Residency Program Director to the director of the VA hospital certifying that the appointed residents, including Dr. Michel, were fully licensed).

3. At the time of the action, Ezekiel and her husband were citizens of the State of Illinois, and

Dr. Michel was a citizen of the State of New Mexico.

4. The government filed affidavits from the VA hospital's Chief of Staff, Chief of Human Resources Management, and the Dean for Clinical Affairs of the Chicago Medical School.

pervision and control the VA hospital's medical staff had over him. At the same time, the court also rejected Ezekiel's argument that the Government should be equitably estopped from asserting that Dr. Michel was a federal employee because, in prior cases, the United States avoided liability under the FTCA by characterizing civilian physicians at VA hospitals as independent contractors. The court substituted the United States as the proper party defendant, and dismissed the complaint for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1), recognizing that because Ezekiel was a federally employed nurse injured on the job, her exclusive remedy against the United States was under the FECA, 5 U.S.C. § 8116(c). Nonetheless, the court apparently also based its order dismissing the complaint on Ezekiel's lack of compliance with the jurisdictional prerequisite of filing an administrative tort claim against the Veterans Administration and thus, failure to exhaust her administrative remedies under the FTCA. *See* 28 U.S.C. § 2675(a); *Deloria v. Veterans Administration*, 927 F.2d 1009, 1011 (7th Cir.1991).

## II. DISCUSSION

### A.

When ruling on a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the district court must accept as true all well-pleaded factual allegations, and draw reasonable inferences in favor of the plaintiff. *Rueth v. United States Environmental Protection Agency*, 13 F.3d 227, 229 (7th Cir.

1993). "The district court may properly look beyond the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Capitol Leasing Co. v. Federal Deposit Insurance Corp.*, 999 F.2d 188, 191 (7th Cir.1993) (per curiam) (quoting *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir. 1979)); *see also Rennie v. Garrett*, 896 F.2d 1057, 1057–58 (7th Cir.1990). We review de novo the district court's dismissal of an action under Rule 12(b)(1). *Bailor v. Salvation Army*, 51 F.3d 678, 684 (7th Cir.1995).

### B.

The sole issue on appeal is whether Dr. Michel, a licensed physician participating in a psychiatric rotation residency program at the VA hospital and receiving no compensation directly from the VA hospital, was a federal employee within the meaning of the Federal Tort Claims Act. The determination is central to the district court's 12(b)(1) ruling because if Dr. Michel was recognized for his services as an independent contractor rather than a federal employee, the case would proceed as a diversity action. If, however, Dr. Michel was a federal employee, then the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the "Westfall Act"), which amended the FTCA and provided absolute immunity to Government employees for torts committed in the scope of their employment, would nullify Ezekiel's claim against Dr. Michel individually and require that she instead proceed only against the United States.[5] 28 U.S.C. § 2679(d)(1).[6]

---

**5.** Prior to 1988, a federal employee who committed a tort while acting within the scope of their employment did not enjoy absolute immunity from suit. *See Westfall v. Erwin*, 484 U.S. 292, 108 S.Ct. 580, 98 L.Ed.2d 619 (1988). In *Westfall*, the Supreme Court held that "the judicially created doctrine of official immunity does not provide absolute immunity to Government employees for torts committed in the scope of their employment," and that a federal employee's immunity from suit "would have to be determined on a case-by-case basis, according to whether 'the contribution to effective government in particular contexts' from granting immunity 'outweighs the potential harm to individual citizens.'" *United States v. Smith*, 499 U.S. 160, 163, 111 S.Ct. 1180, 1183, 113 L.Ed.2d 134 (1991) (quoting *Westfall*, 484 U.S. at 295–96, 108 S.Ct. at 583–84 and *Doe v. McMillan*, 412 U.S.

306, 320, 93 S.Ct. 2018, 2028, 36 L.Ed.2d 912 (1973)).

In response to the Supreme Court's decision in *Westfall*, Congress amended the FTCA by enacting the Federal Employees Liability Reform and Tort Compensation Act (commonly known as the Westfall Act), Pub.L. No. 100–694, 102 Stat. 4563, to provide government employees the immunity that the Court had refused to recognize in *Westfall*. *Smith*, 499 U.S. at 163, 111 S.Ct. at 1183–84. FTCA thus authorizes suits against the United States "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 1346(b).

**6.** The FTCA provides for substitution of the United States as defendant, in lieu of its employee

Once the United States is substituted as the defendant, the FTCA no longer applies, nor will the requirement of exhaustion of administrative remedies as the district court has apparently held. Ezekiel's exclusive avenue of redress against the Government for her work-related injures is the Federal Employees' Compensation Act (FECA), 5 U.S.C. § 8101, *et seq..* *See* 5 U.S.C. § 8102(a) ("The United States shall pay compensation . . . for the disability or death of an employee resulting from personal injury sustained while in the performance of his duty. . . ."). It is undisputed that Ezekiel's injury was incurred while she was performing her nursing duties at the VA hospital. The liability imposed under FECA supplants all other liability on the part of the United States to an injured federal employee. Section 8116(c) provides:

> The liability of the United States . . . with respect to the injury or death of an employee is exclusive and instead of all other liability of the United States . . . to the employee, his legal representative, spouse, dependents, next of kin, and any other person otherwise entitled to recover damages from the United States . . . because of the injury or death in a direct judicial proceeding, in a civil action, or in admiralty, or by an administrative or judicial proceeding under a workmen's compensation statute or under a Federal tort liability statute.

As the Supreme Court makes clear in *Lockheed Aircraft Corp. v. United States:*

> FECA's exclusive-liability provision . . . was designed to protect the Government from suits under statutes, such as the Federal Tort Claims Act, that had been enacted to waive the Government's sovereign immunity. In enacting this provision, Congress adopted the principal compromise— the *"quid pro quo"*—commonly found in workers' compensation legislation: employees are guaranteed the right to receive immediate, fixed benefits, regardless of fault and without need for litigation, but in return they lose the right to sue the Government.

460 U.S. 190, 193–94, 103 S.Ct. 1033, 1036, 74 L.Ed.2d 911 (1983). Under the statutory scheme, the Secretary of Labor is vested with the power to "administer, and decide all questions arising under" the FECA and the Secretary's action in denying or granting compensation is final, conclusive and not subject to review by a court of law. *See* 5 U.S.C. §§ 8128(b),[7] 8145. Thus, by reason of the FECA's judicial door-closing provision, the district court would be without subject matter jurisdiction to entertain Ezekiel's action if it were to be found to be an action against the Government under the FECA, *see Bruni v. United States,* 964 F.2d 76, 78 (1st Cir.1992); *Bush v. Eagle–Picher Industries, Inc.,* 927 F.2d 445, 450 (9th Cir.1991); *Heilman v. United States,* 731 F.2d 1104, 1109 (3d Cir.1984) (if a claim is covered under FECA, then the federal courts have no subject matter jurisdiction to entertain the action), except for perhaps certain constitutional challenges. *See Woodruff v. U.S. Dept. of Labor,* 954 F.2d 634, 639 (11th Cir. 1992) (per curiam); *Paluca v. Secretary of Labor,* 813 F.2d 524, 525–26 (1st Cir.), *cert. denied,* 484 U.S. 943, 108 S.Ct. 328, 98 L.Ed.2d 355 (1987); *Rodrigues v. Donovan,* 769 F.2d 1344, 1347–48 (9th Cir.1985). Of course, the FECA does not bar a federal employee from seeking recovery from a third

defendant upon the Attorney General's certification that the defendant employee acted within the scope of his employment when the alleged incident occurred:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United

States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1).

7. Section 8128(b) provides:
> The action of the Secretary or his designee in allowing or denying a payment under this subchapter is—
> (1) final and conclusive for all purposes and with respect to all questions of law and fact; and
> (2) not subject to review by another official of the United States or by a court by mandamus or otherwise.

party. *Lockheed Aircraft,* 460 U.S. at 191, 103 S.Ct. at 1035. Thus, we return to the question of whether Dr. Michel was an independent contractor (i.e. a third party) or a federal employee within the meaning of the FTCA. A finding of federal employee status would convert the action into a suit against the United States under the FECA and deprive the district court of jurisdiction because of the FECA's prohibition of judicial review. Whether Dr. Michel was an employee of the United States for purposes of the FTCA is a question of federal law. *United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 1975–76, 48 L.Ed.2d 390 (1976); *Logue v. United States,* 412 U.S. 521, 528, 93 S.Ct. 2215, 2219–20, 37 L.Ed.2d 121 (1973); *Quilico v. Kaplan,* 749 F.2d 480, 483 (7th Cir. 1984). *See also Martinez v. Lamagno,* — U.S. ——, ——, 115 S.Ct. 2227, 2236, 132 L.Ed.2d 375 (1995). This court has characterized the inquiry of determining whether one is an "employee of the government" under FTCA as a pure question of law and a matter of statutory interpretation. *See Sullivan v. United States,* 21 F.3d 198, 201 (7th Cir.), *cert. denied,* — U.S. ——, ——, 115 S.Ct. 670, 130 L.Ed.2d 604 (1994); *Quilico,* 749 F.2d at 485–87 (examining the congressional intent and the statutory scheme in determining whether physicians and surgeons appointed to the VA Department of Medicine and Surgery for a fixed period of time (duration of residency commitment) are immune from liability by FTCA).

The FTCA defines an "employee of the government" to include "*officers or employees of any federal agency ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation.*"[8] 28 U.S.C. § 2671. Dr. Michel was a psychiatric resident physician in training employed by the VA hospital without compensation. He was certified by the Attorney General's

designee pursuant to 28 U.S.C. § 2679(d)(1) to be a federal employee acting within the scope of his employment at the time of the incident.[9] The Government argues that the Attorney General's certification is *prima facie* evidence of Dr. Michel's status as a federal employee, requiring the plaintiffs to come forward with specific evidence to rebut the certification. Because the plaintiffs have failed to present any facts, evidence, or law to rebut the certification, the Government's argument continues, they failed to meet their burden of proof and thus, the certification is conclusive. In *Hamrick v. Franklin,* 931 F.2d 1209 (7th Cir.), *cert. denied,* 502 U.S. 869, 112 S.Ct. 200, 116 L.Ed.2d 159 (1991), this court addressed whether the Attorney General's certification was even reviewable by a federal court. We concluded that it was, a holding recently confirmed and settled by the Supreme Court in *Martinez v. Lamagno,* — U.S. ——, 115 S.Ct. 2227, 132 L.Ed.2d 375 (1995). We said in *Hamrick* that once the Attorney General certifies that a defendant employee was acting within the scope of his federal employment, the plaintiff bears the burden of demonstrating otherwise. 931 F.2d at 1211. The question in *Hamrick* involved whether the defendant federal employees had been acting within the scope of their employment, and not whether the defendant was a federal employee. Here, Ezekiel does not suggest that Dr. Michel had exceeded the scope of his employment. Ezekiel's contention is that Dr. Michel was never a federal employee, but rather worked for the VA Hospital as an independant contractor. Turning to the certification provision, 28 U.S.C. § 2679(d)(1), it provides: "Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of incident ..., any civil action ... shall be deemed an action against the United States." By its language, the

---

8. The term "federal agency" includes "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, *but does not include any contractor with the United States.*" 28 U.S.C. § 2671 (emphasis added). The Depart-

ment of Veterans Affairs is an executive department of the United States. 38 U.S.C. § 301.

9. The Attorney General has delegated the authority to furnish the certification to the Chief of the Civil Division of the United States Attorney's Office. *See* 28 C.F.R. § 15.3.

provision assumes that the defendant is a federal employee. The certification, therefore, answers the question of whether the named defendant was acting within the scope of his federal employment, not the threshold question of whether the defendant was a federal employee. Thus, the burden established by the Attorney General's certification that a particular federal employee acted within the scope of his employment is inapplicable to Ezekiel's contention that Dr. Michel was at no time a federal employee.

■ The statutory scheme under which Dr. Michel was appointed (to serve as a resident physician in training in the VA hospital under the supervision and direction of the VA hospital medical staff) clearly establishes that he was a federal employee rather than an independent contractor. Pursuant to 38 U.S.C. § 7405,[10] the Secretary of Veterans Affairs is authorized to "employ" medical residents on a temporary full-time basis. Under 38 U.S.C. § 7406, the Secretary may establish residency and internship positions and appoint qualified persons to such positions (without regard to civil service or classification laws, rules or regulations), and "may prescribe the conditions of employment of persons appointed ... including necessary training...." 38 U.S.C. § 7406(b); *see Mann v. United States*, 904 F.2d 1, 2 (2d Cir.1990) (per curiam) (stating that "Congress has explicitly authorized veterans' hospitals to employ interns and residents," and had also provided veterans' hospitals with "broad authority to train" resident physicians participating in specialty residency programs). Dr. Michel was appointed by the Secretary of Veterans Affairs pursuant to these provisions as a resident physician at the VA hospital in north Chicago for the academic year 1991 to 1992. The statutory

appointment by an executive department convinces us that Dr. Michel was an employee of the Government, especially because the statutory provisions refer to one appointed under them as "personnel" of the Department of Veterans Affairs. *See Carrillo v. United States*, 5 F.3d 1302, 1305 (9th Cir. 1993) (recognizing that individuals appointed pursuant to 38 U.S.C. § 7405 are considered government "personnel"). *Cf. Sullivan v. United States*, 21 F.3d 198, 202 (7th Cir.1994) (fact that federal public defenders were statutorily appointed "suggests that an individual holding that office is an officer or employee of the judicial branch"). Furthermore, the fact that the Secretary is authorized to establish medical residency programs and prescribe employment conditions for such positions, including necessary training and supervision, further serves to establish our conclusion that a medical specialty resident appointed to a VA hospital is a federal employee.

It is of no moment that Dr. Michel was on a "without compensation" status at the hospital and not compensated directly by the VA for his services. As indicated before, the statutory definition of government employee expressly includes individuals appointed "without compensation." *See* 28 U.S.C. § 2671. In fact, the method by which residents appointed in VA hospitals are ultimately compensated is detailed by statute and further establishes that a resident is a federal employee. In Title 38 of the United States Code, § 7406 explicitly provides that "in order to carry out more efficiently the provisions [authorizing the appointment of residents and interns], the Secretary may contract with one or more hospitals, *medical schools* (such as the Chicago Medical School), or medical installations having hospital facilities and participating with the Department in the training of interns or residents" to provide stipend payments and fringe benefits. The Secretary then reimburses the designat-

---

**10.** Section 7405 provides:

(a) The Secretary, upon the recommendation of the Under Secretary for Health, may employ, without regard to civil service or classification laws, rules, or regulations, personnel as follows:

(1) On a temporary full-time basis, part-time basis, or without compensation basis, persons in the following positions:

. . . .

(D) Other professional, clerical, technical, and unskilled personnel (including interns, residents, trainees, and students in medical support programs).

ed medical school or hospital "an amount to cover the cost for the period such intern or resident serves in a Department hospital" of, among other things, stipends, medical care, life insurance and other employee benefits. *See* 38 U.S.C. § 7406(c). Significantly, any period of service of any intern or resident appointed pursuant to § 7406 in a VA hospital is deemed creditable service for purposes of 5 U.S.C. § 8332 in determining eligibility for federal employee retirement benefits. 38 U.S.C. § 7406(c)(3)(B). Thus, it is clear that the statute treats a resident physician appointed to a VA hospital as personnel in the Department of Veterans Affairs, and while serving in this capacity he is classified an employee of the Government. Indeed, according to affidavits submitted by the Government, Dr. Michel was treated as such by the Chicago Medical School as well as the VA hospital.[11]

Our conclusion that Dr. Michel, as a resident at the VA hospital, was a federal employee within the meaning of the FTCA is consistent with our holding in *Quilico v. Kaplan*, 749 F.2d 480 (7th Cir.1984). In *Quilico*, we addressed whether licensed physicians appointed pursuant to the statutory predecessor to section 7405 (38 U.S.C. § 4114), on a temporary basis, to VA hospitals are immune under the FTCA for medical malpractice liability. We noted that VA hospitals' affiliation with teaching hospitals and medical schools was designed to recruit highly qualified physicians to the full-time, part-time, and visiting staffs of the VA hospitals,

and that "immunity from liability was beyond all doubt intended as an inducement [to attract the most qualified physicians]."[12] *Id.* at 485–87. We found that Congress did not intend to limit the section 4116 (now § 7316) immunity to permanent physicians/employees. This is true because Congress was cognizant that VA hospitals were comprised of both temporary and career physicians or surgeons, and yet still broadly defined section 4116 to require the Attorney General to defend "any person" listed under 4116(a) (which included physicians, surgeons, and other medical personnel). *Id.* at 480 n. 1. In holding that a resident physician appointed under section 4114 to a VA hospital on a temporary employment status is immune from malpractice liability, we in effect determined that a temporary physician's statutory appointment under section 4114 (the predecessor of the provision under which Dr. Michel was appointed) renders him a federal employee under the FTCA.

The plaintiffs urge this court to analyze the degree of supervision and control the VA hospital had over Dr. Michel in determining his status. In support, the plaintiffs cite a line of cases that applied the so-called "strict control" test to hold that physicians in private practice who are under contract with the government are independent contractors. Under the "strict control" test, an individual's status "depends upon the amount of governmental agency control of physical performance of the [individual's] day-to-day activities."[13] *Bailor*, 51 F.3d at 685 (citing *United*

---

**11.** David Trace, M.D., the Dean for Clinical Affairs of the Chicago Medical School stated in his affidavit:

> A resident who rotates through the North Chicago V.A. Medical Center for medical training is under the direct supervision of the medical staff at the V.A. and is considered by the Chicago Medical School to be an employee of the V.A. during their [sic] time of training at the V.A.

Similarly, Robert Grant, Chief of Human Resources Management for the North Chicago Veterans Administration Medical Center, provided in his affidavit that a resident doing a medical rotation at the medical center under WOC [without compensation] pay status is appointed pursuant to 38 U.S.C. § 7405 and 38 U.S.C. § 7406, and thus is considered an employee of the medical center.

**12.** We stated in *Quilico:*

> Congress in adopting [sections 4114 and 4116] was attempting to secure the services of the most qualified physicians and surgeons in their respective specialties in a particular geographical area and that immunity from liability was beyond all doubt intended as an inducement.... Since a grant of immunity under section 4116 to physicians and surgeons employed on a temporary basis for a fixed period of time under section 4114 furthers the section 4114 goal of improving the recruitment of the most qualified specialized medical personnel and the overall quality of medical care in VA hospitals, it was the obvious intent of Congress that those doctors recruited to serve on a temporary basis for a fixed period of time should also enjoy the immunity protection of section 4116.

749 F.2d at 487.

**13.** First fashioned in *United States v. Orleans,* 425 U.S. 807, 96 S.Ct. 1971, 48 L.Ed.2d 390

States v. Orleans, 425 U.S. 807, 815, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976) and *Logue v. United States,* 412 U.S. 521, 527–28, 93 S.Ct. 2215, 2219–20, 37 L.Ed.2d 121 (1973)); *see also Carrillo,* 5 F.3d at 1304 ("[t]he critical test for distinguishing an agent from a contractor is the existence of federal authority to control and supervise the 'detailed physical performance' and 'day to day operations' of the contractor, and not whether the agency must comply with federal standards and regulations"). Applying this "strict control" test, the circuit courts have held that physicians in private practice or associated with a private organization under contract to provide medical services at facilities operated by the federal government are not federal employees under the FTCA. *See Carrillo,* 5 F.3d at 1305; *Leone v. United States,* 910 F.2d 46, 50 (2d Cir.1990), *cert. denied,* 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 213 (1991); *Lilly v. Fieldstone,* 876 F.2d 857, 860 (10th Cir.1989); *Bernie v. United States,* 712 F.2d 1271, 1273 (8th Cir.1983); *Wood v. Standard Products Co., Inc.,* 671 F.2d 825, 829–32 (4th Cir.1982). Each of the courts which found such physicians to be independent contractors relied, in part, on the need, and ethical obligation, of licensed physicians to base their treatment decisions on independent judgment. *See, e.g., Carrillo,* 5 F.3d at 1305 (the government did not control private physicians's "actions in diagnosing and treating patients"); *Lilly,* 876 F.2d at 860 (observing that the Army did not control the physician's individual decisions); *see also Lurch v. United States,* 719 F.2d 333, 337 (10th Cir.1983), *cert. denied,* 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984) ("[b]ecause a physician must exercise his own professional judgment, no one controls the detailed physical performance of his duties").

This court, however, has found the "strict control" test inapplicable when determining whether physicians working in federal medical facilities are federal employees, but for the same reason that other circuit courts have found contract physicians to be independent contractors. We reasoned in *Quilico:*

> ... [P]hysicians and surgeons have an ethical obligation to exercise independent judgment that prevents the Department of Medicine and Surgery from strictly controlling or supervising the specific judgments made by the professional when performing surgery or providing other medical care treatment. Because both permanent and temporary physicians and surgeons appointed ... under 38 U.S.C. §§ 4104, 4114 respectively, have [such an obligation], we hold that the strict control test—governmental authority to control the professional performance of his duties—is inappropriate in determining whether Congress intended that a section 4114 physician is to be immunized from liability by section 4116.

749 F.2d at 485. We reaffirm our position in *Quilico* that the "strict control test" is inappropriate to determine whether a resident physician in training is a federal employee or an independent contractor for purposes of invoking the FTCA immunity. The reason is that each and every licensed physician, regardless of his status, must fulfill his ethical obligations to exercise independent judgment when providing treatment and patient care, and his conduct may not exceed the bounds of his oath [14] or canons of medical ethics. Because the strict control test would regard every physician as independent, the test does not differentiate between those physicians clearly intended by Congress to receive immunity and those who are not. For instance, Congress has indicated unambiguously that the government may be liable for a physician's negligence or malpractice under the FTCA *if that physician is an employee of the government.* See 38 U.S.C. § 7316 (defining VA "medical care employee" to whom the FTCA extends immunity to include "phy-

(1976) and *Logue v. United States,* 412 U.S. 521, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973), the Supreme Court applied the "strict control" test in *Orleans* (use of county jails for federal prisoners) and *Logue* (federal funding of a local community program) to determine whether employees of an outside agency used by the federal government are entitled to immunity under the FTCA. As we have noted in *Quilico,* neither case involved a professional, such as a physician, who has an ethical obligation under professional standards

and ethical rules to exercise independent judgment. *Quilico,* 749 F.2d at 483 n. 8.

**14.** For instance, the Hippocratic oath has served as a widely used ethical guide for the medical profession. It pledges the physician to, among other things, "prescribe regimen for the good of my patients according to my ability and my judgment...." *See* The American Medical Association Encyclopedia of Medicine, 539 (1989); Dorland's Illustrated Medical Dictionary, 768 (28th ed. 1994).

sicians"); [15] *Carrillo,* 5 F.3d at 1305 n. 2; *Lurch,* 719 F.2d at 337 n. 7. Delving into the degree of control exercised by the Department of Veterans Affairs over the individual physicians working for the VA hospitals may be of little utility in determining whether physicians are federal employees, since those physicians clearly covered by the FTCA may also be considered independent contractors under the "strict control" test. *See Lurch,* 719 F.2d at 337 (observing that the traditional control test is inappropriate for employees such as doctors who exercise professional judgment because the test would disqualify all physicians from immunity, which was not Congress' intent).

On the other hand, the "strict control" test may be a rational approach to determine a physician's status where the physician's provision of services was pursuant to a contractual agreement and his or her relationship to the government is not unambiguously governed by statute to be an employer-employee relationship. Indeed, all of the cases relied on by the plaintiffs involve physicians in private practice or associated with a private organization under contract with a governmental agency to provide medical treatment and services, and none involves a statutory appointment as in *Quilico,* or as in the case at bar. *See Carrillo,* 5 F.3d at 1305 (distinguishing physicians under contract with the government from physicians appointed to VA hospitals by a federal statute; stating that statutorily appointed physicians, as contrasted with contractual physicians, are considered government "personnel" and entitled to immunity under the FTCA).

In any event, even if we were to apply the "strict control" test to the present case, the result would be the same. Dr. Michel was a resident physician in training, and not a board certified psychiatrist. His principal role at the VA hospital was to receive specialized training in the field of psychiatry and experience in performing patient care assignments. As such, Dr. Michel was certainly subject to a higher degree of supervision and control by the VA hospital medical staff than would a private physician acting as an independent contractor under contract with the government. *See, e.g., Costa v. United States,* 845 F.Supp. 64, 66 (D.R.I.1994) (applying the "strict control" test and finding resident physicians to be under the direct supervision and control of attending VA physicians for purposes of invoking immunity under the FTCA). Dr. Michel's relationship to the hospital is clearly distinguishable from that of a physician under contract with the government to provide medical services: the latter is hired to perform a particular service required by a government medical facility. Notably, none of the cases cited by the plaintiffs involve a resident physician in training. Indeed, while we found the "strict control" test inappropriate in determining a licensed physician's status because of the physician's independent ethical obligations, we recognized in *Quilico* that "residents in training programs performing specific medical services may very well be considered under the direct technical and professional supervision and control of the staff." *Id.* at 484 n. 10. As discussed before, in establishing residencies and internships pursuant to his statutory authority, the Secretary is also authorized to "prescribe the conditions of employment of persons appointed ..., *including necessary training* ...." 38 U.S.C. § 7406(b) (emphasis added). *See Mann,* 904 F.2d at 2 (holding that § 4114 amply authorizes veterans' hospitals to employ interns and residents and to allow them, as part of their training, to provide medical care under the appropriate supervision). The Chicago Medical School, the co-sponsor of Dr. Michel's psychiatric residency program, considered Dr. Michel to be under the direct supervision and control of the VA hospital's medical staff or any other approved hospital while serving in that facility's training program.[16] The VA hospital as well as other hospitals participating in the Chicago Medical School's residency training program also considered residents such as Dr. Michel to be supervised employees. The Chief of Human Resources Management for the VA hospital stated in his affidavit that "[u]nder WOC [without compensation] pay status the residents are appointed to receive

---

**15.** A medical care employee is broadly defined to include not only physicians, but all types of support personnel rendering medical care or treatment. 38 U.S.C. § 7316(a)(2).

**16.** Even if Dr. Michel could also be considered an employee of the Chicago Medical School, it

does not change our analysis. Dr. Michel was under the supervision and control of the VA hospital's psychiatric medical staff at that particular time in his residency training program while

specialized experience in performing patient care assignments under supervision and may rotate through any number of participating medical facilities for this training." As part of the training, resident physicians must follow the directions of the hospital's qualified medical staff and defer to the judgment of their superiors. We recognize that resident physicians regularly are called to make independent decisions both in the presence and during the absence of supervisory physicians. However, this does not alter the training and educational nature of their employment. Experience in making informed independent decisions regarding a patient's care and treatment is an integral part of a resident's training. The fact that no member of the VA hospital's medical staff was actually supervising Dr. Michel during the specific time frame of Ezekiel's injury does not alter the result.[17] The concept of supervision, in any employment setting, does not connote the continuous presence of a superior. Where as here the resident's challenged conduct involved the simple and routine medical task of drawing blood from a patient, it could hardly be expected that a VA medical staff member should have been on site to supervise him. In short, even under the "strict control" test, Dr. Michel qualifies as an "employee of the Government" for purposes of the FTCA. Accordingly, the district court properly granted the government's motion to substitute. Once Ezekiel's suit is deemed to be an action against the United States, her only remedy is under the FECA, requiring the district court to dismiss the action for lack of subject matter jurisdiction.

### C.

■ The plaintiffs argue that the doctrine of judicial estoppel precludes the government from asserting that a resident physician employed by a VA hospital is a federal employee. "Judicial estoppel prevents a party that has taken one position in litigating a particular set of facts from later reversing its position when it is to its advantage to do so." *Levinson v. United States*, 969 F.2d 260, 264 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 505, 121 L.Ed.2d 441 (1992); *see also Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir.1993) ("[a] litigant is forbidden to obtain a victory on one ground and then repudiate that ground in a different case in order to win a second victory"); *Chrysler Motors Corp. v. International Union*, 2 F.3d 760, 764 (7th Cir.1993). "The principle is that if you prevail in Suit # 1 by representing that A is true, you are stuck with A in all later litigation growing out of the same events." *Astor Chauffeured Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1547 (7th Cir.1990)). Judicial estoppel serves "to protect the courts from being manipulated by chameleonic litigants who seek to prevail, twice, on opposite theories." *Levinson*, 969 F.2d at 264. Although the doctrine has no precise definition, we have identified certain prerequisites to its application:

> First, the later position must be clearly inconsistent with the earlier position. Also, the facts at issue should be the same in both cases. Finally, the party to be estopped must have convinced the first court to adopt its position; a litigant is not forever bound to a losing argument.

*Id.* at 264–65 (internal citations omitted).

■ The doctrine of judicial estoppel is inapplicable in this case. As an initial matter, this court has generally considered the applicability of the doctrine only when there are successive litigations arising from the same factual circumstance, which is not the case here. *See, e.g., Patz v. St. Paul Fire & Marine Ins. Co.*, 15 F.3d 699, 702 (7th Cir. 1994); *Chrysler Motors Corp.*, 2 F.3d at 764; *Continental Illinois Corp. v. C.I.R.*, 998 F.2d 513, 518–19 (7th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 685, 126 L.Ed.2d 652 (1994); *Astor*, 910 F.2d at 1547–48; *Levinson*, 969 F.2d at 264–65. More importantly, the government has not taken a position inconsistent with its position in any previous

---

providing medical services for the VA hospital. Under the "borrowed servant" doctrine, an employee directed or permitted by his employer to perform services for another may become the servant of such other in performing the services if the temporary employer exercises such control over the conduct of the employee as would make the employee his servant. *See,* Restatement (Second) of Agency § 227 (1958). Thus, even assuming that Dr. Michel's primary employer was the Chicago Medical School, his primary employment with the residency program will not prevent him from being considered an employee of the government.

**17.** Drawing blood from a patient would not generally be considered a task requiring direct supervision.

case. Inconsistent positions result only when the government raises contradictory arguments in response to the *same* set of facts. *Id.* Although the government has argued successfully in prior actions that fully-trained, private physicians working under contract with government agencies were independent contractors, Dr. Michel was a resident physician, completing his specialty medical training in the field of psychiatry at the VA hospital at the time of Ezekiel's injury, and was not a fully-trained and Board certified psychiatrist. As stated above, a resident in training is different from a fully-trained, private physician working pursuant to a contractual agreement with the VA hospital, especially with respect to the degree of supervision and control exercised by members of the hospital's medical staff. Presumably, the VA hospitals contracted with licensed private physicians for their specialized expertise and medical judgments. The same can hardly be said about resident physicians whose principal role at the VA hospital is to receive training rather than to provide specialized patient care. Therefore, because the government's position in this case is not inconsistent with its position in any prior action, judicial estoppel is inapplicable.

## III. CONCLUSION

The judgment of the district court is

AFFIRMED.